

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-15-2007

# Fadiga v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 05-4910

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Fadiga v. Atty Gen USA" (2007). *2007 Decisions.* Paper 841.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/841

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-4910
_____

SORIBA FADIGA,

Petitioner

v.

ATTORNEY GENERAL USA,

Respondent
_____

On Petition for Review of an Order
of the Board of Immigration Appeals
(BIA No. A76-550-629)
Immigration Judge: Hon. Charles M. Honeyman

Argued November 27, 2006
_____

Before: FUENTES and GARTH, Circuit Judges, and POLLAK,[*]
District Judge

_____

(Filed: June 15, 2007)
_____

_____

[*] Honorable Louis H. Pollak, District Judge for the United
States District Court of the Eastern District of Pennsylvania,
sitting by designation.

Daniel G. Anna, Esquire (argued)
Anna & Anna, P.C.
533-A Darlington Road
Media, PA 19063

Counsel for Petitioner

Patrick L. Meehan, Esquire
United States Attorney
Robert A. Zauzmer, Esquire
Assistant United States Attorney, Chief of Appeals
Emily McKillip, Esquire (argued)
Assistant United States Attorney
Office of United States Attorney
615 Chestnut Street Suite 1250
Philadelphia, PA 19106

Richard M. Evans, Esquire
Nancy E. Friedman, Esquire
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, DC 20044

Counsel for Respondent

———

OPINION OF THE COURT

———

POLLAK, District Judge:

On May 7, 2004, an Immigration Judge (IJ) ordered that Soriba Fadiga be removed to Guinea. Fadiga moved to reopen the removal proceedings, Fadiga's counsel acknowledging that he had provided ineffective assistance in presenting Fadiga's application for asylum and withholding of removal under the Immigration and Nationality Act (INA) and protection under the Convention

Against Torture (CAT). Before the IJ could rule on the motion to reopen, new counsel appealed the order of removal to the Board of Immigration Appeals (BIA). The BIA considered the motion to reopen filed in the Immigration Court as a motion to remand and denied the appeal and the motion, concluding in part that Fadiga had not shown "prima facie eligibility for either withholding of removal under section 241(b)(3) of the [INA] or protection pursuant to the Convention against Torture," and that "as a result . . . [Fadiga] has [not] demonstrated that he has been prejudiced by the actions of his former attorney." E.R.[1] at 5 (BIA Dec.). In support of its conclusion, the Board found "with regard to [Fadiga's] application for withholding of removal under [the INA] . . . the record fails to establish that it is 'more likely than not' that he would be in danger of future persecution." *Id.* The Board also found "that [Fadiga] has failed to demonstrate his eligibility under the Convention Against Torture," because "the record is devoid of any evidence that [Fadiga] has ever been tortured in the past, [and] there is also is [sic] insufficient evidence to demonstrate a clear probability that he would be subject to future torture in Guinea." *Id.*

Fadiga now petitions this court for review of the BIA's final order of removal as to his claims for withholding under the INA and protection under the CAT.[2] Upon examination of the BIA's decision and order, we conclude that the Board abused its discretion in denying Fadiga's motion to reopen/remand. Therefore, for the reasons stated below, we will grant the petition, vacate the decision and order of the BIA, and remand to the agency with directions to reopen Fadiga's case. In addition, we take this opportunity to clarify the analytical framework for claims of ineffective assistance of counsel in removal proceedings.

---

[1] The abbreviation "E.R."refers to the excerpt of record provided by the petitioner (in an appendix to his brief); "A.R." refers to the full administrative record.

[2] Fadiga does not challenge the denial of his asylum claim.

3

## I. BACKGROUND

In reviewing Fadiga's underlying claim of ineffective assistance of counsel, the details of the proceedings before the IJ—specifically, the hearing on Fadiga's application for asylum, or in the alternative withholding of removal, or in the alternative protection under the CAT[3] [hereinafter "application for asylum" or "application"]—are of primary concern. Therefore, in this section of the opinion, we (1) summarize the procedural history of the case, (2) describe in some detail the evidence and arguments presented to the Immigration Court and the IJ's oral decision, and (3) outline the supplementary evidence sought to be submitted to the BIA and the BIA's decision affirming the denial of Fadiga's application for asylum and denying Fadiga's motion to reopen/remand.

### A. Procedural History

Soriba Fadiga entered the United States on April 21, 1991 on a non-immigrant visa that expired May 31, 1991. On September 10, 2002, the INS issued and served on Fadiga a Notice to Appear alleging that he was a non-immigrant who had overstayed his visa. Fadiga conceded removability on this ground, but filed an application for asylum under section 208 of the INA, 8 U.S.C. § 1158, withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), and protection under Article III of the CAT.[4]  *See supra* note 3. A hearing on this application—denominated a Form I-589—was held on May 7, 2004. At the conclusion of the hearing, the IJ issued an oral decision denying the request for asylum as time-barred, denying

---

[3] On February 3, 2003, Fadiga filed a single document (Form I-589, *see* A.R. at 300) requesting these three forms of relief in the alternative.

[4] *See* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted* Dec. 10, 1984, 1465 U.N.T.S. 85, implemented in the United States by the Foreign Affairs Reform and Restructuring Act, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

the requests for withholding of removal under the INA and protection under the CAT on the merits, and ordering Fadiga removed to Guinea.

On May 26, 2004, through his original counsel, Daniel Pell, Fadiga filed a motion in the Immigration Court seeking to reopen the removal proceedings. But on June 4, 2004, Fadiga—now represented by new counsel, Ryan Osborne—filed a notice of appeal with the BIA. As authorized by 8 C.F.R. § 1003.2(c)(4), the BIA then took jurisdiction over both the appeal and the motion to reopen, considering the latter as a motion to remand. The sole ground of the appeal and of the motion to reopen was the alleged ineffective assistance provided by Pell. On October 6, 2005, a single member of the BIA filed a three-page decision and order dismissing Fadiga's appeal and denying the motion to reopen/remand.[5]

## B. Proceedings before the Immigration Court

### 1. Substantive evidence presented

At the merits hearing on May 7, 2004, Fadiga submitted evidence in the form of his own testimony, as well as several exhibits. Fadiga's testimony presented, in relevant part, the following set of facts:

Soriba Fadiga, who was 44 years old at the time of the 2004 hearing, is a native and citizen of Guinea, a Muslim, and an ethnic

---

[5] Although the fact that the BIA "consider[ed Fadiga's] motion [to reopen] as a motion to remand" creates some ambiguity of terminology, it has no substantive effect on our review. "We consider [motions to reopen and motions to remand] as equivalent for jurisdictional and standard of review purposes . . . . Both devices require the proceedings to be reopened, . . . and as such they are functionally identical." *Korytnyuk v. Ashcroft*, 396 F.3d 272, 282 (3d Cir. 2005); *accord In re L-V-K-*, 22 I. & N. Dec. 976, 978 (BIA 1999) (en banc). For the sake of clarity and consistency, in the balance of this opinion we refer to Fadiga's motion as a "motion to reopen."

Mandingo. He claimed to have been to be a close relative of Sékou Touré, the first president of independent Guinea, who held that office from 1958 until his death in 1984. From at least the early 1980s, Fadiga was active in Sékou Touré's political party, the PDG,[6] serving as a regional secretary of youth. Shortly after Sékou Touré died, a coup ousted the PDG from power and installed a new president, Lansana Conté. Whereas Sékou Touré, like Fadiga, had been of Mandingo or Malinké ethnicity, Lansana Conté was an ethnic Soussou.

At the May 7, 2004 hearing, Fadiga was, according to the IJ, "quite animated about [political] problems that his family had" after the PDG lost power, including the politically motivated murder of at least one relative, Fadiga's uncle Ismail Touré. E.R. at 21 (Oral Dec. of IJ). Fadiga testified that, as a result of these problems, his father left Guinea for Côte d'Ivoire in or around 1986. As to his own political problems, Fadiga further testified that he had been a founding member of a post-coup, opposition party—the RPG, led by Alpha Condé—and that, after "problems associated with the 1990 elections," he too was at risk. *Id.* at 20–21. For this reason, in early 1991, Fadiga also fled to Côte d'Ivoire. Soon after Fadiga's departure, an arrest warrant was issued for him by the Guinean government, apparently on a charge of "public disorder." *See* A.R. 403 (purported arrest warrant stating charge as "pour désordre publique"). From Côte d'Ivoire, Fadiga was able to pay money to procure a fraudulent Guinean passport and United States visa. He traveled to the United States from Côte d'Ivoire in April 1991. Fadiga continued to be "actively involved" with the RPG party in the United States, through his involvement in the expatriate Guinean community, and he has participated in demonstrations here against President Conté. E.R. at 22–23 (Oral Dec. of IJ).

Fadiga asserted at the May 7, 2004 hearing that he "fear[ed] being arrested, tortured, or killed" if he were to return to Guinea and that he was "100% sure" that he would be arrested at the

---

[6] The full appellations associated with various Guinean political-party acronyms were a source of controversy at the hearing, as discussed below in note 8 and the accompanying text.

airport and taken to prison. *Id.* at 18 (IJ's summary of Fadiga's testimony). He cited his Mandingo tribal roots, his family's political affiliation, his former position as a youth leader of an opposing political party (the PDG), his subsequent RPG membership, and his continuing protest activity while in the United States as factors which would cause him to be targeted by the Conté regime.

The evidence offered by Fadiga in support of the above testimony included, in relevant part, six documents from governmental and non-governmental agencies and the media regarding human rights abuses in Guinea, and three additional documents offered to corroborate Fadiga's version of the facts. The corroborating documents were (1) a purported original Guinean arrest warrant issued against Fadiga on January 5, 1991; (2) a document dated January 3, 1993, purportedly showing Fadiga to be a member of the "RPG" political party; and (3) a second document verifying Fadiga's affiliation with the RPG as of October 15, 2003.[7]

## 2. Discrepancies in the evidence

The IJ found "dramatic inconsistencies" between Fadiga's testimony and his application for asylum. E.R. at 34; *see also id.* at 23 (noting "glaring discrepancies between [Fadiga's] application for asylum and his testimony in court"). However, Fadiga claimed before the IJ, and continues to claim, that these discrepancies resulted not from mendacity or inconsistencies in his memory, but from errors made by counsel. The discrepancies at issue relate to at least the following matters:

- Education The IJ found the testimony as to Fadiga's early education "somewhat confusing" and noted significant

---

[7] The arrest warrant is described in the IJ's oral decision as being issued "January 5, 1981," and the first RPG certificate is described as "dated January 3, 1983." E.R. at 10. However, the administrative record reflects that the years should read "1991" and "1993." *See* A.R. at 400–404; *see also* Respt.'s Br. 8 n.5, 10.

7

discrepancies in the dates of attendance and the names of schools between the application for asylum and Fadiga's testimony at the hearing. E.R. at 19, 24; Respt.'s Br. 8 n.3. As discussed below, Fadiga attributed the inconsistency to attorney error in filling out the asylum application. He also claimed that the "Gamal Abdel Nasser University" referred to in his testimony was merely another name for the "College de Garçons" listed in the application. E.R. at 24 (Oral Dec. of IJ); A.R. 216–18 (Tr. of May 7, 2004 Hr'g); Respt.'s Br. 8 n.3.

- Fadiga's familial relation to Sékou Touré  The IJ found the testimony to be unclear as to whether Fadiga was a nephew or a cousin of Sékou Touré.

- Guinean Political Parties  There was confusion at the hearing regarding the various Guinean political parties, and whether Fadiga's testimony about them was consistent and credible. *See* E.R. at 18–19 (Oral Dec. of IJ) ("[R]espondent gave various names for the parties in attempting to explain their differences and similarities."); A.R. at 172, 174–75, 179–83, 234–35 (Tr. of May 7, 2004 Hr'g); *see also* Respt.'s Br. 7–9. Based on the record, as well as reported cases of this and other Circuits addressing similar claims, it appears that the parties actually involved were the PDG (Sékou Touré's ruling party prior to the coup) and the RPG (one of the main opposition parties, founded after the 1984 coup and led by Alpha Condé).[8]

---

[8] "PDG" stood for "Parti Démocratique de Guinée" ("Democratic Party of Guinea" or "Guinean Democratic Party"). *See* A.R. at 442.

"RPG" appears to stand for "Rassemblement du Peuple de Guinée." *See* A.R. at 401, 407 (membership documents submitted by Fadiga); A.R. at 429 (excerpt of Amnesty International 2000 country report for Guinea), *available at* http://web.amnesty.org/report2000/countries/; *see also Dia v. Ashcroft*, 353 F.3d 228, 245 (3d Cir. 2003) (en banc). However, what appears to be the same party has been referred to by other,

8

However, the IJ noted that the application for asylum "suggested" that Fadiga was a member of the "RPR" or "Rassemblement Pour Republique"—a party that apparently does not exist in Guinea. E.R. at 27; *see also* Respt.'s Br. 7–9.[9] Again, Fadiga attributed the discrepancy to attorney error.

- Timing of Fadiga's move to Ivory Coast  Although Fadiga claimed to be the youth secretary of his political party in Guinea from 1984 to 1991, his application "suggests he was in the Ivory Coast" at that time. E.R. at 23 (Oral Dec. of IJ); Respt.'s Br. 9. Fadiga claimed that the application must have been meant to refer to his father's presence in the Ivory Coast.

As to all of the above inconsistencies, the IJ stated that

related French names. *E.g.*, *Makhalou v. Gonzales*, 173 Fed. App'x 378, 379 (6th Cir. 2006) ("Rassemblement Pour La Guinee (RPG)").

Moreover, the English translation of the RPG's name varies widely, even among the documents and published reports found in the record. *Compare* A.R. at 401 (notarized translation: "People Rally of Guinea (R.P.G.)"), *with* A.R. at 406 (notarized translation by different translator: "Rally for the People of Guinea"), *and* A.R. at 416 (U.S. State Dept. 2003 country report on Guinea: "Guinean People Party (RPG)"), *and* A.R. at 429 (Amnesty International country report, *supra*: "Guinean People's Rally"), *and* A.R. at 426 (June 11, 2003 BBC News article: "Rally for Guinean People (RPG)"), *available at* http://news.bbc.co.uk/2/hi/africa/2982066.stm. *See also Dia*, 353 F.3d at 245 ("'Rally of the People of Guinea Party' or 'RPG'"); *Camara v. Gonzales*, 166 Fed. App'x 840, 841 (6th Cir. 2006) ("Guinean People's Gathering Party ('RPG')"); *Toure v. Ashcroft*, 400 F.3d 44, 45 (1st Cir. 2005) (per curiam) ("Reunion for the People of Guinea ('RPG')").

[9] The record does, however, show that Guinea has a "PRP" ("Party for Renewal and Progress"). *See* A.R. at 35.

Fadiga "essentially blamed his attorney and his attorney's staff," citing errors in the preparation of the application, which Fadiga did not review before it was filed. E.R. at 24. The IJ further noted that, when pushed on cross-examination about why he hadn't produced more evidence in support of his claims, Fadiga responded "that if he had known or been told by anybody, he would have produced many witnesses and much more in the way of evidence." *Id.* at 25; *see also, e.g.*, A.R. at 239 (Tr. of May 7, 2004 Hr'g).[10]

### 3. Fadiga's representation by original counsel, Daniel Pell[11]

Fadiga and his original counsel, Daniel Pell, stated at the hearing that neither of them had reviewed Fadiga's application with care, either before filing the application or in preparation for the hearing. Fadiga repeatedly insisted that all of the mistakes in the application should be attributed to the preparers. When asked about his contacts with his counsel, Fadiga initially stated that he had spoken by telephone with Bonnie Shue, a secretary in Pell's office, and then met with Shue and Pell at Pell's office to prepare the application for asylum.

However, after a break in testimony and a chance for Fadiga to confer with counsel, Pell made a proffer to the court that Fadiga had met with a law student who was working in Pell's office at the

---

[10] Fadiga: "[I]f I knew that I could bring people with me in here, it was going to be more than 100 to come . . . especially my family." IJ: "Did you talk to your lawyer about how you were going to prepare to prove your case?" Fadiga: "If he told me to bring people, I would bring, I would bring . . . . even our [RPG] secretary in New York. I was gonna bring all of them here, but I didn't know that. If I know that I was gonna bring them."

[11] Much of this information was elicited on redirect of Fadiga by the IJ, who, though "very careful not to tread on" attorney-client privilege, nevertheless felt that, since Fadiga had placed his representation at issue, Fadiga necessarily had made a limited waiver of the privilege. E.R. at 26 (Oral Dec. of IJ).

time.[12]  Pell stated that "[t]here have been issues in other cases with regard to the adequacy of [the student's] preparation of I-589's," and that the law student's involvement in the preparation of the application "may or may not account for the discrepancies" between the application and Fadiga's testimony.  A.R. at 241 (Tr. of May 7, 2004 Hr'g).  Pell further stated, as a "separate issue," that "had [Fadiga] known that he should have produced witnesses . . . we would have and can produce at least four witnesses." *Id.*  The IJ, however, rejected a proffer of the names and addresses of those witnesses, stating that it "was really to [sic] late" and that such matters would be more appropriately raised in a motion to remand.  E.R. at 28 (Oral Dec. of IJ); *see also* A.R. at 242–43 (Tr. of May 7, 2004 Hr'g).

### 4.  The IJ's findings and decision

In his oral decision, announced at the conclusion of the May 7, 2004 hearing, the IJ denied the application in its entirety, finding that Fadiga had not met his burden of proof as to asylum,[13] withholding of removal, or CAT protection.  While not making an explicit adverse credibility finding, the IJ repeatedly referenced "[t]he credibility issues [which] on their face abound in this case." E.R. at 34.  Specifically, the IJ cited "dramatic inconsistencies" as to Fadiga's educational history and his country of residence between 1984 and 1991, as well as the "mentioning of a [political] party on the application for asylum that does not even exist in Guinea."  E.R. at 34; *see supra* Part I.B.2.  The IJ was less concerned about Fadiga's fraudulent passport and visa, because of the evidence indicating rampant corruption and ease of obtaining purportedly authentic official documents in Guinea.  However, the

_____

[12] It is unclear from Pell's statement whether Pell meant that Fadiga only met with the law student, or met with the law student in addition to meeting with Pell and Shue.

[13] The IJ's primary holding as to the asylum claim was that Fadiga's application was time-barred, but the IJ also held, in the alternative, that the asylum claim failed on the merits.  As noted above, *see supra* note 2, Fadiga does not challenge the denial of his asylum claim.

IJ found that this same apparent unreliability of Guinean documents undercut much of the probative value of the purported arrest warrant and RPG party membership records—particularly since these were "documents not supported by detailed affidavits or testimonial corroboration." E.R. at 34. Although he noted his "concerns about what perhaps could have been presented on this record but was not," the IJ concluded that "[o]n this record, . . . [Fadiga] has not met his burden of proof and persuasion for asylum . . . [or] for withholding of removal," and, under "[a] separate analysis[,] . . . [Fadiga] has not proven that he is more likely than not to be tortured." *Id.* at 36.

Notwithstanding his finding of substantial infirmities in the proof, the IJ repeatedly expressed concern about the quality of Fadiga's legal representation, stating, in part, that

> [Fadiga,] throughout his testimony, seemed to be completely surprised that there would be any additional evidence required of him to meet his burden of proof. . . . [He] claims he did not know any other evidence should have been produced and [that he] could certainly do so.
>
> [Fadiga] has made very serious allegations and the Court is concerned about this record. . . . Obviously, there are major credibility issues in this case, but both in terms of credibility and burden of proof, [Fadiga] essentially is blaming his attorney and his office. Throughout his testimony, [Fadiga] never blamed his attorney directly, but it is certainly without dispute that an attorney's office's obligation is to avoid negligence and ineffective assistance of counsel.

*Id.* at 34; *see also id.* at 28 ("This is not an easy case for the Court to decide because of the preparation issues raised by [Fadiga] . . . .").[14]

---

[14] The tenor of the IJ's discussion and reasoning is reflected in a longer excerpt from the oral decision:

Noting that Daniel Pell, the lawyer representing Fadiga at the May 7, 2004 hearing, appeared frequently before the Immigration Court and that Pell had presented a "very serious analysis" of other issues in Fadiga's case, the IJ "hesitate[d] to conclude that this particular attorney has done anything that would be considered ineffective assistance of counsel" with respect to the application for asylum. *Id.* at 35. Moreover, the IJ emphasized that he had taken into account all evidence submitted up to the deadline of ten days prior to the hearing. *Id.* at 38. Although

In preparing for this case, this Court could only assume that the evidence in Exhibit 6 [i.e., the documents described above, *supra* text accompanying note 7], coupled with [Fadiga's] testimony, was the evidence that [Fadiga] sought to present in presenting his case at the individual calendar hearing this date.

Prior to issuing this decision, counsel for [Fadiga], in effect, urges that the additional evidence be permitted or that [Fadiga] could have easily . . . presented such evidence, but he simply didn't know. It is certainly strange (indiscernible) absent additional evidence that was not presented today, to determine what exactly went on between [Fadiga] and his attorney that, according to [Fadiga], led [Fadiga] to have absolutely no idea as to what burden of proof meant in these administrative proceedings. The Court has concerns about what . . . could have been presented . . . but was not. On the other hand, in light of the ease [of obtaining the fraudulent passport] . . . the Court cannot inherently rely on the arrest warrant and the RPG documents to assume that everything that [Fadiga] is stating is true, and that everything that resulted in evidentiary gaps can merely be attributed to his counsel's staff.

E.R. at 35–36.

13

evidence could be submitted after the deadline "for good cause," the IJ did "not find good cause in these proceedings that the respondent didn't know he had a responsibility to meet his burden of proof and had an opportunity to submit both testimonial evidence, documentary evidence or other forms of corroboration." *Id.* Thus, although the IJ seemed well aware that this was a close case likely destined for review, *see id.* at 37 ("A reviewer of this record . . . [will] have to determine whether or not the evidence presented in these proceedings, given [Fadiga's] testimony and the representations of counsel, resulted in a fundamentally fair hearing."), he concluded, "[a]s of today, the Court does not find that the fundamental[] fairness prescription has been abrogated." *Id.* The IJ noted, however, that the BIA might be presented with additional evidence justifying remand for "additional proceedings." *Id.* at 38.

## C. The BIA's review

Fadiga filed a timely appeal with the BIA, and the BIA also took jurisdiction over Fadiga's motion to reopen. *See supra* Part I.A. Fadiga was represented on appeal by new counsel, Ryan Osborne, and raised a single claim of ineffective assistance of counsel. In support of his claim, Fadiga offered affidavits from himself, from several potential corroborating witnesses, and from his former counsel, Daniel Pell.

### 1. The affidavits

In addition to seven witness affidavits supporting his substantive claims for asylum, withholding and CAT protection,[15] Fadiga submitted affidavits from himself and former counsel Daniel Pell as evidence of the alleged ineffective assistance of counsel at the Immigration Court hearing.

Pell, according to his affidavit, had, as of 2004, been practicing law for twenty-nine years and had never been the subject

---

[15] The statements of the seven witnesses were identical and corroborated Fadiga's account of his background in Guinea and his political affiliations. *See* A.R. at 38–51.

of discipline or censure. Pell attested that Fadiga met with Pell's assistant, a law student, on one occasion, in late 2002 or early 2003, for the purpose of preparing the Form I-589; that he (Pell) was not present at this meeting; and that he later relied on the student's work, "erroneously" assuming the application to be complete and accurate. E.R. at 40 (Pell Aff.) ¶ 7. Because of this erroneous assumption, Pell failed to review the Form I-589 with Fadiga when they met in Philadelphia prior to a master calendar hearing on February 5, 2003—nor did he advise Fadiga to review the Form I-589 before signing it. At that meeting, Pell simply collected money orders from Fadiga for the filing fees and presented Fadiga with the typewritten form to sign. Pell later met with Fadiga in March 2004 to review his case and wrote to Fadiga on March 31, 2004 advising him of the date of the merits hearing

> and of the need for him to bring to my office "any additional written evidence that you have and we can review the country conditions in your case. If you have any letters, video tapes, or any evidence of any nature that you want to submit, you must bring it along, with two (2) copies of each document or tape, video tape or other document with you to the office."

*Id.* at 41 (Pell. Aff.) ¶ 9. Fadiga did deliver documents (i.e., the exhibits submitted to the IJ) to Pell, but Pell is "certain" that they did not "review the contents of [Fadiga's application], or discuss in detail any issues of testimony or proof." *Id.* ¶ 10.

On May 6, 2004—the day before the merits hearing—Pell, according to his affidavit, met with Fadiga for forty-five minutes, "reviewing the 'country conditions' and the general nature of his claims," but "for some unknown reason [Pell] did not ask [Fadiga] to review his [application]." *Id.* ¶¶ 11–12. "Further, [Pell] did not advise Mr. Fadiga to produce witnesses or declarations regarding his familial ties to former President . . . Sekou Toure, his membership in the R.P.G., . . . the treatment of R.P.G. members by the government, or . . . treatment of [Touré's] family members . . . by the government." *Id.* ¶ 13. Pell, therefore, was "completely surprised and taken aback by the factual contradictions between [the application] and [Fadiga's] testimony at the merits hearing."

15

*Id.* ¶ 12. Pell stated in his affidavit that—had he in fact reviewed the application for asylum with Fadiga—"the problems with the factual inconsistencies . . . would have been cured prior to the merits hearing." *Id.* ¶ 14. Specifically, the "fact[s] that [Fadiga] never left Guinea before 1991" and that his party was called RPG and not RPR, as well as "the correct names and dates of the educational institutions he attended[,] would have been established of record without contradiction." *Id.* Furthermore, Pell was "quite certain . . . that Mr. Fadiga could and would have produced witnesses or affidavits or declarations to prove his familial relationship to Sekou Toure"; the treatment of Touré family members by "the government of Lasana Conte, the President for Life of Guinea"; Fadiga's membership in the RPG; and the treatment of "members and/or officials of the R.P.G. by the government." *Id.* ¶ 15. Pell based the latter statement on the fact that "at least 5 or 6 members of the [Philadelphia] Guinean community appeared in the Courtroom to support" Fadiga at an earlier hearing in York, Pennsylvania. *Id.*

Pell concluded his affidavit by "sincerely apologiz[ing]" for "not having been more thorough," noting that "I know better," and offering "[n]ot by way of excuse, but only by way of explanation" his belief at the time that the documents from the RPG officials and the arrest warrant "should have sufficed to establish the necessary evidentiary nexus between Mr. Fadiga and the R.P.G." *Id.* at 42 (Pell Aff.) ¶¶ 16–17. However, he noted that this belief was "of no avail" due to the "shadow . . . cast over [Fadiga's] credibility, when he testified contrary to many important items contained [in the application]." *Id.* ¶ 17.

While Fadiga's affidavit largely conformed to the facts stated by Pell in his affidavit, it also added several new facts. In particular, Fadiga attested that on May 6, 2004—the day before the hearing—Pell raised with him the possibility of having a particular witness testify on his behalf, and that Fadiga told Pell that this would not be possible on short notice. Fadiga also reiterated that "[a]t no time prior to the merits hearing did Attorney Pell advise me to review my written applications for relief, or the importance of such a review," E.R. at 44 (Fadiga Aff.) ¶ 13; that "Attorney Pell never advised me to . . . [submit witnesses or affidavits] concerning my familial relationship to Sekou Toure or my membership in the

16

R.P.G.," *id.*; and that Pell "led me to believe that submitting documents to the Court [i.e., the three documents discussed above, *supra* text accompanying note 7] would be sufficient to establish my membership in the R.P.G., and the fact that I am wanted by the Government of Guinea for arrest." *Id.* ¶ 14. Finally, Fadiga stated in his affidavit that "[h]ad I been advised by my attorney" to bring witnesses or obtain "letters, affidavits or declarations" concerning the various elements of his claims for relief, "I could and would have produced many such witnesses, declarations, or affidavits," *id.* at 44–45 (Fadiga Aff.) ¶ 15, and that "had I been advised by my attorney, Daniel Pell, to carefully review the [application for asylum], I would have done so, and would have corrected the written application to reflect" the account presented at the hearing. *Id.* at 45 (Fadiga Aff.) ¶ 16.

## 2. The BIA decision

The BIA, in a decision and order dated October 6, 2005, found that, regardless of whether Fadiga had met the procedural requirements for advancing an ineffective-assistance-of-counsel claim or whether he had demonstrated that his counsel's performance was deficient, his motion had to be denied because he had not been prejudiced by any such deficient performance. As to the asylum claim, the BIA found that there was no prejudice because that claim was time-barred. As to withholding of removal under the INA, the Board found that, even assuming the inadequacy of Fadiga's legal representation, "the record fails to establish that it is 'more likely than not' that he would be in danger of future persecution as either" a relative of Sékou Touré or an RPG member. E.R. at 5. This finding was based on the Board's view that (1) Fadiga was not a victim of past persecution (and so did not receive a presumption of future persecution), and (2) although there were State Department reports of "isolated incidents of harassment of RPG members in 2003," without corroboration of the purported arrest warrant, "the record fails to demonstrate a clear probability that [Fadiga] would be targeted for future persecution." *Id.* As to the application for withholding under the CAT, the Board similarly found that the record was "devoid of any evidence that [Fadiga] has ever been tortured in the past," and that "there is also is [sic] insufficient evidence to demonstrate a clear probability that he would be subject to future torture in Guinea." *Id.* Concluding

17

that Fadiga had therefore "failed to demonstrate prima facie eligibility" for withholding under either section 241(b)(3) of INA or Article III of the CAT, and that he thus could not establish "that he has been prejudiced by the actions of his former attorney," the BIA dismissed Fadiga's appeal and denied his motion to reopen. *Id.*

Fadiga filed a timely petition for review in this court, and he now challenges the final order of removal on the ground that the BIA erroneously denied his motion to reopen as to withholding of removal under the INA and protection under the CAT.

## II. JURISDICTION AND SCOPE OF REVIEW

The Immigration Court had jurisdiction over Fadiga's application for asylum, withholding of removal and protection under the CAT pursuant to 8 C.F.R. § 1208.2(b). The BIA had jurisdiction to review the IJ's decision under 8 C.F.R. § 1003.1(b) and was authorized to consider Fadiga's motion to reopen pursuant to 8 C.F.R. § 1003.2(c)(4). *See Korytnyuk v. Ashcroft*, 396 F.3d 272, 282 (3d Cir. 2005) (motion to reopen filed during pendency of appeal is properly heard by BIA). We have jurisdiction to review final orders of removal under 8 U.S.C. § 1252(a)(1). *See Voci v. Gonzales*, 409 F.3d 607, 612 (3d Cir. 2005). Because "there is no 'final order' until the BIA acts," *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001), we review only the decision of the BIA, "absent special circumstances not present here."[16] *Id.* at 545.

"[W]e review the [BIA's] denial of a motion to reopen for abuse of discretion." *Guo v. Ashcroft*, 386 F.3d 556, 562 (3d Cir. 2004). "Under the abuse of discretion standard, the Board's decision must be reversed if it is arbitrary, irrational, or contrary to law." *Sevoian v. Ashcroft*, 290 F.3d 166, 175 (3d Cir. 2002)

---

[16] Where the BIA explicitly adopts "or invokes specific aspects of the IJ's analysis and factfinding in support of the BIA's conclusions," we have authority to "review[] both decisions." *Voci*, 409 F.3d at 613; *see also Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir. 2004); *Abdulai*, 239 F.3d at 549 n.2.

(internal quotation marks omitted).  However, we review de novo the Board's determination of an underlying procedural due process claim.  *See Bonhometre v. Gonzales*, 414 F.3d 442, 447 (3d Cir. 2005), *cert. denied*, 126 S. Ct. 1362 (2006); *De Leon-Reynoso v. Ashcroft*, 293 F.3d 633, 635 (3d Cir. 2002).  Since claims of ineffective assistance of counsel in immigration proceedings are grounded in the "Fifth Amendment right to due process," *Zheng v. Gonzales*, 422 F.3d 98, 106 (3d Cir. 2005); *see infra* Part III.A, we think that such claims should be reviewed de novo.[17]  Finally, questions of law, such as whether the BIA applied the correct legal standard in considering the motion to reopen and the underlying claim of denial of due process, are also reviewed de novo.  *See Borges v. Gonzales*, 402 F.3d 398, 404 (3d Cir. 2005).

## III.  DISCUSSION

On this petition for review, Fadiga contends that the BIA "erroneously concluded that the Petitioner's applications had not been prejudiced by the ineffective assistance of his counsel." Petr.'s Br. 7.  Fadiga argues that the alleged errors of counsel in failing to prepare him for the hearing or to inform him of the types of evidence that might be helpful to his application were

---

[17] It does appear that in one instance this court employed abuse-of-discretion language in reviewing a claim of ineffective assistance of counsel.  *See Zheng*, 422 F.3d at 108 ("[T]he BIA seems to have been . . . within its discretion to find that no prejudice resulted from [the] ineffective appellate assistance.").  However, our cases both before and after *Zheng* have consistently held that "we review de novo the question of whether [a petitioner's] procedural due process rights have been violated." *Mudric v. Att'y Gen.*, 469 F.3d 94, 98 (3d Cir. 2006); *accord Cabrera-Perez v. Gonzales*, 456 F.3d 109, 115 (3d Cir. 2006) (per curiam) ("We review the denial of a motion to reopen a removal order entered *in absentia* for abuse of discretion, but we review de novo the legal question whether Cabrera's due process rights were violated." (citation omitted)); *Alaka v. Att'y Gen.*, 456 F.3d 88, 94 n.8 (3d Cir. 2006); *Bonhometre*, 414 F.3d at 447; *Abdulrahman v. Ashcroft*, 330 F.3d 587, 595–96 (3d Cir. 2003); *Chong v. INS*, 264 F.3d 378, 386 (3d Cir. 2001).

"fundamental" and "deprived [him] of any real opportunity to produce evidence to substantiate and corroborate his claims." Petr.'s Br. 8. With this as a predicate, Fadiga challenges the logic and fairness of the BIA's denial of his motion to reopen—the denial being based on the BIA's determinations that "'the record fails to demonstrate a clear probability that he would be targeted for future persecution'" and that "'there is also insufficient evidence to demonstrate a clear probability that he would be subject to future torture in Guinea.'" Petr.'s Br. 8 (quoting BIA Dec., E.R. at 5). According to Fadiga, "this BIA language specifically defines the prejudice that occurred. The 'record fails to demonstrate' because of the failure of counsel to help his client create a record that demonstrated anything." Petr.'s Br. 8.

In response, the government argues that the denial of Fadiga's motion to reopen was "not arbitrary or capricious and thus not an abuse of discretion." Resp.'s Br. 17. According to the government, "[t]he BIA found that even assuming [competent representation], Fadiga's claim would have failed because he did not prove that he would probably be persecuted or tortured . . . . Because Fadiga did not show a reasonable probability that the result of the proceeding would have been different if his attorney had been effective, the BIA therefore held that Fadiga had failed to prove that he was prejudiced by his attorney's allegedly ineffective assistance." *Id.* The government further argues that "[i]n any event, Fadiga's ineffectiveness claim could not succeed because he did not satisfy all of the requirements set forth in *Matter of Lozada*, 19 I. & N. Dec. 637, 639 (BIA 1988)"—an issue that appears not to have been expressly resolved by the BIA because of the BIA's dispositive finding that Fadiga could not establish prejudice. Resp.'s Br. at 19 n.10.

In the balance of this opinion, we first lay out the framework for evaluating an ineffective-assistance-of-counsel claim in removal proceedings (addressing, along the way, the government's contention that *Lozada* bars Fadiga's claim). We then undertake to determine the proper standard for determining prejudice within

that framework,[18] concluding, in accord with the view of the government, that our recent decision in *United States v. Charleswell*, 456 F.3d 347 (3d Cir. 2006), establishes that the proper inquiry is whether there is a "reasonable likelihood" (or, synonymously, a "reasonable probability") that the result would have been different given effective assistance of counsel. In light of this determination, we then examine the BIA's decision in this case and conclude that the BIA erred in requiring Fadiga to show a "clear probability" that the result would have been different. Finally, we find that, in the proceedings in the Immigration Court, counsel's representation of Fadiga was deficient; and we further find that, had counsel rendered effective assistance, there is a "reasonable likelihood" that Fadiga would have prevailed.

## A. Ineffective assistance of counsel in removal proceedings

A claim of ineffective assistance of counsel in removal proceedings is cognizable under the Fifth Amendment—i.e., as a violation of that amendment's guarantee of due process. *Zheng*, 422 F.3d at 106; *Lu v. Ashcroft*, 259 F.3d 127, 131 (3d Cir. 2001); *see also Abdulai*, 239 F.3d at 549 ("[A]liens facing removal are entitled to due process."); *accord Hernandez v. Reno*, 238 F.3d 50, 55 (1st Cir. 2001) ("[W]here counsel does appear for the [alien], incompetence in some situations may make the proceeding *fundamentally unfair* and give rise to a Fifth Amendment due process objection." (emphasis in original)). Where an alien claims a denial of due process because he was "prevented from making his case to the BIA or the IJ," *Abdulai*, 239 F.3d at 549,[19] he must

---

[18] Neither party's initial filings in this court expressly addressed the standard applicable to the determination of prejudice in this context, but we requested and heard oral argument on the issue and subsequently received a follow-up letter brief from the government.

[19] *Abdulai* identifies three requirements of due process in removal proceedings. "An alien: (1) is entitled to factfinding based on a record produced before the decisionmaker and disclosed to him or her; (2) must be allowed to make arguments on his or her own behalf; and (3) has the right to an

show (1) that he was "prevented from reasonably presenting his case" and (2) that "substantial prejudice" resulted. *Khan v. Att'y Gen.*, 448 F.3d 226, 236 (3d Cir. 2006) (internal quotation marks omitted). Furthermore, in addition to these substantive requirements for establishing a denial of due process, a due process claim based on an allegation of ineffective assistance of counsel must meet certain procedural requirements established by the BIA. *See Matter of Lozada*, 19 I. & N. Dec. 637, 639 (BIA 1988). These so-called *Lozada* requirements serve as a threshold and a screening mechanism to help the agency "assess the 'substantial number' of ineffective assistance claims that it receives." *Lu*, 259 F.3d at 132 (quoting *Lozada*, 19 I. & N. Dec. at 639).

### 1. *Lozada*'s threshold procedural requirements

*Matter of Lozada* sets forth the procedural requirements which must be satisfied before the BIA considers a Fifth Amendment-based claim of ineffective assistance of counsel on its merits. The alien must (1) support the claim with an affidavit attesting to the relevant facts; (2) inform former counsel of the allegations and provide counsel with the opportunity to respond (this response should be submitted with the alien's pleading asserting ineffective assistance); and (3) state "whether a complaint has been filed with appropriate disciplinary authorities regarding [the allegedly deficient] representation, and if not, why not." *Lozada*, 19 I. & N. Dec. at 639. In *Lu*, "[w]e generally agree[d] that the [*Lozada*] three-prong test is not an abuse of the Board's wide-ranging discretion." 259 F.3d at 132; *accord Zheng*, 422 F.3d at 106; *see also Hernandez*, 238 F.3d at 55 (praising *Lozada* as an appropriate method of "cop[ing] with the . . . problem . . . . that such claims are easily made and compromise finality" (citation omitted)).

---

individualized determination of his or her interests." 239 F.3d at 549 (citations and internal quotation marks omitted). It is the second requirement which is implicated by ineffective-assistance claims such as Fadiga's.

### a. Was Fadiga required to file a complaint with disciplinary authorities?

There is no dispute that Fadiga complied with the first two *Lozada* requirements—filing an explanatory affidavit and providing former counsel with an opportunity to respond. Nor is it disputed that Fadiga did *not* file a complaint with a bar grievance committee or other "appropriate disciplinary authorities," *Lozada*, 19 I. & N. Dec. at 639, in regard to Daniel Pell's allegedly deficient performance. Accordingly, the government argues that if the BIA had not denied Fadiga's motion on the prejudice issue, it would have had to do so "because of his failure to comply with *Lozada*"—that is, because "Fadiga neither filed a disciplinary complaint nor explained his failure to do so." Respt.'s Br. 19 n.10.

In its brief discussion of *Lozada*'s complaint requirement, the Board's decision and order in this case noted that "ordinarily" and "[i]n most cases" a complaint would be required. However, the decision and order then included "cf." citations to page 134 of our opinion in *Lu*, *supra*, and to the Pell affidavit. In *Lu,* we noted the "dangers . . . in applying a strict, formulaic interpretation of *Lozada*" and, on the page cited by the BIA, we stressed that the filing of a complaint "is not an absolute requirement" and that "the failure to file a complaint is *not* fatal if a petitioner provides a reasonable explanation." *Lu*, 259 F.3d at 133, 134 (emphasis in original).[20] In its citation to the Pell affidavit, the Board noted Pell's "accept[ance of] responsibility for the aforementioned errors." E.R. at 4.[21] Although the Board then went on to deny the motion on finding no prejudice, without explicitly ruling on the

---

[20] *See also Zheng* 422 F.3d at 106 ("'[O]nly in rare circumstances have courts refused to reopen immigration proceedings *solely* because a petitioner failed to file a bar complaint.'" (quoting *Lu*, 259 F.3d at 133, 134 (emphasis in original))); *Ponce-Leiva v. Ashcroft*, 311 F.3d 369, 374 (3d Cir. 2003); *Chmakov v. Blackman*, 266 F.3d 210, 213 n.3 (3d Cir. 2001).

[21] Pell also acknowledged the ineffectiveness in the motion to reopen filed with the IJ on May 26, 2004.

*Lozada* requirements, a logical interpretation of the Board's citations—coming directly after its statement that the complaint requirement "ordinarily" and "in most cases" would apply—is that the Board found the Pell affidavit to be a "reasonable explanation," *Lu*, 259 F.3d at 134, for the failure to file a complaint.

Whether or not the Board intended to so rule, such a ruling would seem the proper one. In explaining that the *Lozada* requirements "need not be rigidly enforced where their purpose is fully served by other means," 259 F.3d at 134 (internal quotation marks omitted), *Lu* detailed several interests served by "the third prong of the *Lozada* test, the so called 'bar complaint' requirement." *Id.* at 132–33; *see also In re Rivera-Claros*, 21 I. & N. Dec. 599, 603–605, 607 (BIA 1996) (en banc) (discussing "multiple purposes behind . . . *Lozada* rule"). These interests include providing a "means of identifying and correcting possible misconduct" in the immigration bar, *Rivera-Claros*, 21 I. & N. Dec. at 604, "deter[ing] meritless claims of ineffective assistance of counsel [and] highlight[ing] the standards which should be expected of attorneys who represent aliens in immigration proceedings," *id.*, "increas[ing the Board's] confidence in the validity of the particular claim[,] . . . . reduc[ing] the likelihood that an evidentiary hearing will be needed[,] . . . . serv[ing the Board's] long-term interests in policing the immigration bar[,] . . . . [a]nd . . . protect[ing] against possible collusion between counsel and the alien client." *Id.* at 605. All of these interests—save the last—are served without a complaint where, as here, prior counsel has fully and openly owned up to his error and provided a detailed affidavit attesting to the problems in the representation. As to the "collusion" rationale, it seems unlikely that a lawyer would go so far as to commit perjury (i.e., intentionally filing a false affidavit) in furtherance of such collusion.

Therefore, we find that the requirement of a complaint was excused in this case where counsel acknowledged the ineffectiveness and made every effort to remedy the situation. *Lozada* provides no bar to Fadiga's claim.

### 2. The substantive error-and-prejudice test

When the *Lozada* requirements are met or excused, the BIA

proceeds to the merits of the underlying ineffective-assistance claim, applying a two-part, error-and-prejudice test. *See Zheng*, 422 F.3d at 107; *cf. Strickland v. Washington*, 466 U.S. 668 (1984) (establishing error-and-prejudice test applicable to Sixth Amendment claims of ineffective assistance of counsel in criminal cases). In evaluating the presentation of an alien's case under this test, the questions addressed are (1) whether "competent counsel would have acted otherwise," *Iavorski v. INS*, 232 F.3d 124, 129 (2d Cir. 2000) (internal quotation marks omitted), and, if yes, (2) whether the alien "was prejudiced by counsel's poor performance," *Zheng*, 422 F.3d at 107.[22] This familiar test, well developed in our Sixth Amendment jurisprudence, serves as a useful surrogate for the due process inquiry, as it measures substantially the same elements required to establish a denial of due process (i.e., whether the alien was prevented from "reasonably presenting his case," resulting in "substantial prejudice," *see supra* Part III.A (quoting *Khan*, 448 F.3d at 236)).[23]

---

[22] *Accord Maravilla Maravilla v. Ashcroft*, 381 F.3d 855, 858 (9th Cir. 2004) (per curiam) (aliens must show (1) that "'counsel [did not] perform with sufficient competence'" and (2) "that they were prejudiced by their counsel's performance" (quoting *Lin v. Ashcroft*, 377 F.3d 1014, 1027 (9th Cir. 2004))); *cf. Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996) (stating *Strickland* error-and-prejudice test in context of Sixth Amendment right to counsel in criminal cases) ("[A] defendant must show both that: (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) the defendant suffered prejudice as a result . . . ." (internal quotations omitted)).

[23] As a matter of formal constitutional doctrine, the Sixth Amendment right to (effective) counsel does not apply in a civil context such as immigration proceedings. Nevertheless, "we cannot treat immigration proceedings like everyday civil proceedings, despite their formally civil character," because "unlike in everyday civil proceedings, 'the liberty of an individual is at stake' in deportation proceedings." *Ponce-Leiva v. Ashcroft*, 331 F.3d 369, 380–81 (3d Cir. 2003) (Rendell, J., dissenting) (quoting *Bridges v. Wixon*, 326 U.S. 135, 154

25

### a. The prejudice standard

Our cases have not heretofore had occasion to put into sharp focus the proper formulation of the standard by which prejudice is to be measured in considering a Fifth Amendment claim of ineffective assistance of counsel in removal proceedings. Those cases that have touched on the question have described the standard in a variety of ways. *E.g.*, *Ponce-Leiva v. Ashcroft*, 311 F.3d 369, 377 (3d Cir. 2003) (asking whether petitioner "was prevented from reasonably presenting his case"); *Zheng*, 422 F.3d at 107 n.6 (finding no prejudice because "Zheng ha[d] given us no reason to believe" that, if counsel had acted competently, the Board "might have reversed the IJ's . . . decision").[24]

The government, in a supplementary letter brief, contends that useful guidance is provided by *Charleswell*, *supra*, a recent case dealing with analogous legal issues in the context of a criminal prosecution for illegal reentry into the United States. In

---

(1945)).

[24] In the Sixth Amendment context, where we have had more opportunities to apply the prejudice standard, we have generally followed the *Strickland* formulation requiring that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, and defining a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome," *id. See Fischetti v. Johnson*, 384 F.3d 140, 155 (3d Cir. 2004); *Sistrunk*, 96 F.3d at 670. However, we have also phrased the standard as a requirement that the defendant "must show . . . a reasonable likelihood that he would not have been convicted." *Thomas v. Varner*, 428 F.3d 491, 502 (3d Cir. 2005), *cert. denied*, 127 S. Ct. 928 (2007); *see also Jermyn v. Horn*, 266 F.3d 257, 311 (3d Cir. 2001) ("[Defendant must show a] reasonable likelihood that the totality of the available mitigating evidence . . . might have led to a different result."); *cf. Strickland*, 466 U.S. at 696 (noting that defendant must "show[] that the decision reached would reasonably likely have been different absent the errors").

*Charleswell,* a defendant subject to prosecution for illegal reentry sought to mount a collateral challenge to the underlying order of removal based on a denial of due process in the deportation proceedings. *See* 456 F.3d at 349. One requirement to succeed on such a challenge is a showing that the underlying deportation proceeding was "'fundamentally unfair.'" *Id.* at 351 (quoting *United States v. Torres*, 383 F.3d 92, 99 (3d Cir. 2004)). A showing of fundamental unfairness in the context faced by the *Charleswell* court required "both that some fundamental error occurred and that as a result of that fundamental error [the alien] suffered prejudice." *Id.* at 358. Noting that "our Court ha[d] never spoken directly to the issue of prejudice" in that context, the *Charleswell* court adopted the position of "the majority of courts that ha[d] addressed" the issue and held that a showing of "prejudice requires a reasonable likelihood that the result would have been different if the error in the deportation proceeding had not occurred." *Id.* at 361–362.

In so ruling, the *Charleswell* court observed that "this standard appears to be analogous to the standard required . . . to prove an ineffective assistance of counsel claim." *Id.* at 361. Indeed, in the case cited by *Charleswell* for this proposition—*United States v. Copeland*, 376 F.3d 61 (2d Cir. 2004)—the Second Circuit expressly adopted the *Strickland* Sixth Amendment standard governing prejudice from alleged ineffective assistance of counsel in criminal proceedings as the standard to be applied, under the Fifth Amendment, to determine prejudice from an alleged denial of due process in removal proceedings. *Copeland*, 376 F.3d at 73 ("[T]he appropriate test for prejudice is the one used to decide ineffective assistance of counsel claims, namely, prejudice is shown where 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (quoting *Strickland*, 466 U.S. at 694)).[25]

_____

[25] Like *Charleswell*, *Copeland* concerned a collateral challenge to an underlying order of removal, based on an asserted denial of due process in the underlying deportation proceedings. The error alleged in the underlying proceedings in *Copeland* was the IJ's failure to inform the alien of his right to

27

We agree with the government that the *Charleswell* "reasonable likelihood" standard—or its equivalent, the "reasonable probability" standard[26]—is also appropriate to the prejudice inquiry in the context of an alleged denial of due process in removal proceedings due to ineffective assistance of counsel. *Charleswell* and *Copeland* applied the "reasonable likelihood" standard to determine prejudice from denials of due process in removal proceedings, in instances where the alleged defect was *not* ineffective assistance of counsel, in part because the alleged defect in the proceedings was "analogous to" ineffective assistance of counsel. We therefore view it as entirely appropriate to apply the "reasonable likelihood" standard in the "close-fitting," *Copeland*, 376 F.3d at 73, circumstance where the alleged defect in the removal proceedings *is* ineffective assistance of counsel. Further,

apply for discretionary relief from removal. *See Copeland*, 376 F.3d at 70. In adopting the *Strickland* standard as the proper one for determining prejudice from such an error, the *Copeland* court explained that:

> Th[e] analogy [between the *Copeland* facts and a case involving alleged ineffective assistance of counsel] is close-fitting because the denial of an opportunity to apply for [discretionary] relief will generally be the result either of a lawyer having caused an eligible alien to fail to apply, or of an IJ, owing special duties to a *pro se* alien, having failed to give notice of such an opportunity. In the latter case, therefore, prejudice is shown where there is a reasonable probability that, but for the IJ's unprofessional errors, the alien would have been granted [discretionary] relief.

*Copeland*, 376 F.3d at 73 (citations omitted).

[26] *See supra* note 24 ("reasonable likelihood" and "reasonable probability" used as equivalent terms in Sixth Amendment ineffective-assistance-of-counsel case law); *compare also Strickland*, 466 U.S. at 694 ("reasonable probability"), *with id.* at 696 ("reasonably likely").

28

the standard is a familiar one and properly requires the alien to show not just that he received ineffective assistance in his removal proceedings, but that the challenged order of removal is fundamentally unfair, because there is a significant likelihood that the IJ would not have entered an order of removal absent counsel's errors. For these reasons, we find that an alien claiming ineffective assistance of counsel in removal proceedings must, in addition to showing that his lawyer committed unprofessional errors, show that there was a "reasonable likelihood that the result would have been different if the error[s] . . . had not occurred." *Charleswell*, 456 F.3d at 362.

## B. The BIA's analysis

The BIA's two-paragraph treatment of Fadiga's ineffective-assistance claim as to withholding of removal under the INA and protection under the CAT reads as follows:

> We now turn to the [Fadiga's] remaining applications for relief. With regard to his application for withholding of removal under section 241(b)(3) of the Act, we find that even if this Board were to assume the truth of [Fadiga's] claim, the record fails to establish that it is "more likely than not" that he would be in danger of future persecution as either a member of Sekou Toure's family or as a member of the RPG party. [Fadiga] is not a victim of past persecution; therefore, he does not qualify for a presumption of future persecution. Furthermore, although the Department of State verified isolated incidents of harassment of RPG members in 2003; inasmuch as [Fadiga] has failed to provide any additional evidence corroborating the validity of the arrest warrant he previously submitted, we find that the record fails to demonstrate a clear probability that he would be targeted for future persecution. Likewise, following consideration of the evidence submitted in support of [Fadiga's] motion, as well as the evidence of record, we find that [he] has failed to demonstrate his eligibility for relief under the [CAT]. We find that not only is the record is [sic]

29

devoid of any evidence that [Fadiga] has ever been tortured in the past, but there is also is [sic] insufficient evidence to demonstrate a clear probability that he would be subject to future torture in Guinea.

Accordingly, [Fadiga] has failed to demonstrate prima facie eligibility for either withholding of removal under [the INA] or protection pursuant to the [CAT]; and as a result, we do not find that [Fadiga] has demonstrated that he has been prejudiced by the actions of his former attorney.

E.R. at 5 (citations and footnote omitted).

Although the Board stated that it was applying a "prima facie eligibility" standard, the Board's analysis reveals that the Board, in fact, held Fadiga to a higher standard—requiring him to demonstrate eligibility for relief under the ultimate standards applicable to claims for withholding of removal and protection under the CAT, i.e., the "more likely than not" or "clear probability" standards.[27] This was error, because those standards are more demanding than the showing properly required to demonstrate prima facie eligibility for relief.

In *Sevoian*, we explained that "the prima facie case standard for a motion to reopen . . . requires the applicant to produce objective evidence showing a 'reasonable likelihood' that he can

---

[27] *See, e.g.*, *Shehu v. Att'y Gen.*, 482 F.3d 652, 657 (3d Cir. 2007) (withholding of removal under INA requires showing of "clear probability of persecution" in the proposed country of removal); *id.* at 658 (protection under the CAT requires showing that alien is "'more likely than not' to be tortured with the consent or acquiescence of the . . . government" in the proposed country of removal). In this context, the "clear probability" and "more likely than not" standards are equivalent, and both standards are equivalent to a "preponderance of the evidence." *INS v. Stevic*, 467 U.S. 407, 424 & n.19 (1984).

30

establish that he [merits relief under the applicable standard]." 290 F.3d at 175; *see also Guo*, 386 F.3d at 563. And in *Guo*, we emphasized that "a 'reasonable likelihood' means merely showing a realistic chance that the petitioner can at a later time establish that asylum should be granted." *Guo*, 386 F.3d at 564. Because the Board had required Guo to "establish" (i.e., by a preponderance of the evidence) eligibility for relief, we found that it had erred by applying an "excessively rigorous standard." *Guo*, 386 F.3d at 564.[28]

Likewise, in ruling on the motion to reopen in Fadiga's case, the BIA applied an "excessively rigorous standard" to the inquiry whether Fadiga had established the prejudice component of his underlying claim of ineffective assistance of counsel. As established in our discussion *supra*, the proper standard was whether there was a "reasonable likelihood" that the outcome of Fadiga's hearing in the Immigration Court would have been different absent the errors allegedly made by his counsel.

While a "reasonable likelihood" of a different outcome

---

[28] We said:

> The Board, . . . in its denial of Guo's motion . . ., stated that she must proceed to end-game and "*establish* that there is a pattern or practice [of enforcing the family planning policy against Chinese nationals with foreign-born children] in her homeland" (emphasis added). In this context, "establish" means the evidence for asylum outweighs the evidence against. A "reasonable likelihood" means merely showing a realistic chance that the petitioner can at a later time establish that asylum should be granted. The distinction may at first appear to be subtle shading, but without it "*prima facie*" (meaning at first sight) would lack meaning.

*Guo*, 386 F.3d at 563–64 (bracketed and parenthetical material in original).

requires more than a showing of "a plausible ground for relief from deportation," *Charleswell*, 456 F.3d at 361 (internal quotation marks omitted), it does not require that a different outcome was more likely than not. The latter point has been made clear in the Sixth Amendment context by repeated pronouncements of the Supreme Court and this Circuit. *See, e.g.*, *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland*."). Most recently, in *Thomas v. Varner*, 428 F.3d 491 (3d Cir. 2005), *cert. denied*, 127 S. Ct. 928 (2007), we explained that

> [t]he prejudice component requires [the defendant] to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. He "need not show that counsel's deficient performance 'more likely than not altered the outcome in the case'—rather, he must show only 'a probability sufficient to undermine confidence in the outcome.'" *Jacobs* [*v. Horn*, 395 F.3d 92, 105 (3d Cir. 2005)] (citing *Strickland*, 466 U.S. at 693–94). "This standard is not a stringent one." *Id.* (internal quotations omitted).

428 F.3d at 502 (parallel citations omitted).[29]

Notably, the Ninth Circuit has had occasion to address a BIA error very similar to the Board's error in the case at bar. In

---

[29] In *Obleshchenko v. Ashcroft*, the Eighth Circuit applied this Sixth Amendment standard of proof to a claim of "ineffective assistance of counsel at deportation or exclusion proceedings." 392 F.3d 970, 972 (8th Cir. 2004) (holding that the required prejudice inquiry "ask[s] whether there is a reasonable probability that the IJ would have altered his judgment had the [alien] been represented by . . . competent counsel," "where 'reasonable probability' means 'a probability sufficient to undermine confidence in the outcome'" (quoting *Strickland*, 466 U.S. at 694)).

*Maravilla Maravilla v. Ashcroft*, 381 F.3d 855 (9th Cir. 2004), the BIA denied a motion to reopen an order directing the removal of a Mexican married couple. *Id.* at 857. The motion to reopen challenged the removal order on ineffective-assistance grounds. *Id.* As the Ninth Circuit explained, the BIA "conclud[ed] that petitioners failed to show that their case outcome 'would have been different but for the alleged ineffectiveness' of counsel." *Id.* at 857 (quoting BIA opinion). Finding that it was error for "the BIA [to] directly adjudge[] the question of whether petitioners would win or lose their claim," the Ninth Circuit granted the petition for review and remanded for "the BIA to consider whether competent counsel would have acted otherwise, and, if so, to consider under the correct standard whether petitioners were thereby prejudiced." *Id.* at 859.

Because, in the case at bar, the BIA applied too rigorous a standard in denying Fadiga's motion to reopen—requiring Fadiga to establish not a "reasonable likelihood" but a "clear probability" of gaining the relief sought (or that he "more likely than not" would prevail)—this court could, following the practice of the *Maravilla Maravilla* court, remand this case to the BIA to afford that tribunal an opportunity to determine whether Pell's representation of Fadiga was deficient and, if so, whether the deficient representation undercut Fadiga's opportunity to present his claims in the Immigration Court.[30]

In the present circumstances, however, we think that it would be an act of supererogation for this court to ask the BIA to determine whether Pell's representation fell below minimal

---

[30] Fadiga contends that the BIA has already addressed the first question—whether Pell's representation of Fadiga was deficient—and has "accepted that ineffective assistance occurred." Petr.'s Br. 7. We read the BIA's opinion differently. We think the BIA merely assumed *arguendo* that Pell's representation of Fadiga was deficient, focusing instead on what the BIA then found to be an absence of prejudice. *See* E.R. at 4 ("[E]ven if the performance of [Fadiga's] prior counsel had been deficient, [Fadiga's] motion must . . . be denied because he has failed to establish [prejudice].").

professional standards, thereby prejudicing Fadiga. The full record of that representation is before us, and we are competent to assess what transpired.

## C. Application of the error-and-prejudice test to Fadiga's claim of ineffective assistance

The Pell affidavit submitted to the BIA—corroborating and expanding on Pell's oral proffer to the IJ—makes it plain that the faulty I-589 was prepared by a law student, was not reviewed by Pell, and was not discussed with Fadiga by Pell in advance of the hearing before the IJ. "Further, [Pell] did not advise Mr. Fadiga to produce witnesses or declarations regarding his familial ties to former President . . . Sekou Toure, his membership in the R.P.G., . . . the treatment of R.P.G. members by the government, or . . . treatment of [Touré's] family members . . . by the government." E.R. at 41 (Pell. Aff.) ¶ 13. Moreover—Pell advised the BIA in his affidavit—Pell was "quite certain . . . that Mr. Fadiga could and would have produced witnesses or affidavits or declarations to prove" Fadiga's relationship to Sekou Touré, Fadiga's membership in the RPG, and the targeting of both Touré family members and RPG "members and/or officials" by the incumbent Guinean government. *Id.* ¶ 15.

These attestations, which are uncontroverted in the record, make clear that Pell's performance "fell below an objective standard of 'reasonableness under prevailing professional norms.'" *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996) (quoting *Strickland*, 466 U.S. at 668). It does not require Pell's coda—"I deeply regret and sincerely apologize for the problems that I have caused this Court, the government attorneys, and Mr. Fadiga, in not having been more thorough in presenting his case from an evidentiary standpoint. I know better." E.R. at 42 (Pell Aff.) ¶ 16—to establish that Pell's failures severely compromised Fadiga's capacity to present his claims cogently in the Immigration Court.[31]

---

[31] Little wonder that, merely on the basis of what Fadiga and Pell told the IJ at the hearing (i.e., before Pell's proffer at the hearing took formal shape as the Pell affidavit submitted to the

Was Fadiga prejudiced by Pell's deficient representation? In our view, the record establishes that Fadiga was prejudiced—i.e., that there would have been a "reasonable likelihood" of Fadiga achieving a favorable outcome at the May 7, 2004 hearing had Pell performed effectively. The IJ's decision was based in large part on doubts about the credibility of Fadiga's testimony—doubts that were predicated on evidentiary inconsistencies which would have been avoided by competent counsel. *See supra* Parts I.B.2–4, I.C.1. In addition, the IJ discounted the probative value of Fadiga's other, documentary evidence in part because it was "not supported by detailed affidavits or testimonial corroboration," E.R. at 34, and it is clear from the record that at least some such corroboration would have been available given competent advice and preparation by counsel. Thus, counsel's errors contributed directly to the evidentiary defects that led the IJ to deny relief. *Cf. Strickland*, 466 U.S. at 695 ("[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the [fact-finder]. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.").

We are also mindful of the ambivalence in the IJ's opinion, *see, e.g.*, *supra* note 14 and accompanying text. The IJ stated that "[t]his is not an easy case for the Court to decide because of the preparation issues raised by [Fadiga]," E.R. at 28—concerns to which the IJ adverted more than once. *E.g.*, E.R. at 34, 36, 37. *Cf. Strickland*, *supra* at 696 ("[A] conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

In sum, we find that there is at least a "reasonable

---

BIA), the IJ noted that "[a] reviewer of this record[,] if an appeal is taken, will . . . have to determine whether or not the evidence presented in these proceedings, given [Fadiga's] testimony and the representations of counsel, resulted in a fundamentally fair hearing." E.R. at 37. (The IJ went on to state that "[a]s of today, the Court does not find that the fundamental[] fairness prescription has been abrogated." *Id.*)

35

likelihood" that, absent the avoidable evidentiary inconsistencies, and with the addition of witnesses who could have corroborated Fadiga's testimony and his documentary evidence, the IJ would have granted Fadiga withholding from removal under the INA, protection under the CAT, or both. Because the record, viewed in light of the correct legal standard for determining prejudice, thus establishes that Fadiga was denied due process, the Board abused its discretion by denying the motion to reopen. Finally, in consideration of the already protracted history of the case, we pretermit further review by the BIA of Fadiga's motion to reopen. It is clear that the IJ must be directed to reexamine Fadiga's claims. "While we cannot yet say that [Fadiga] is entitled to [relief], we are persuaded that [he] at least deserves a hearing." *Guo*, 386 F.3d at 564.

## IV. CONCLUSION

For the reasons stated, the petition for review is granted, the October 6, 2005 decision and order of the Board of Immigration Appeals is vacated, and the case is remanded to the Board of Immigration Appeals with directions to remand to the Immigration Court for reopening of petitioner Soriba Fadiga's case.