

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-22-2008

# Rranci v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 06-3327

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Rranci v. Atty Gen USA" (2008). *2008 Decisions.* Paper 574.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/574

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-3327

_____

NAZMI RRANCI,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES

_____

On Petition for Review of an Order of
The Board of Immigration Appeals
Immigration Judge: Honorable Henry S. Dogin
(No. A96-077-564)

_____

Argued December 11, 2007

Before: SLOVITER and AMBRO, <u>Circuit Judges</u>
RESTANI,[*] <u>Chief Judge</u>

_____

[*]Honorable Jane A. Restani, Chief Judge, United States
Court of International Trade, sitting by designation.

(Opinion filed August 22, 2008)

Rex Chen, Esquire (Argued)
Catholic Charities of the Archdiocese of Newark
976 Broad Street
Newark, NJ   07102

      Counsel for Petitioner

Gregory G. Katsas
   Acting Assistant Attorney General, Civil Division
David V. Bernal
   Assistant Director, Office of Immigration Litigation
Richard M. Evans, Esquire
Andrew C. MacLachlan, Esquire (Argued)
Susan K. Houser, Esquire
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC   20044-0000

      Counsel for Respondent

Baher A. Azmy, Esquire (Argued)
Lori Nessel, Esquire
Meetali Jain, Esquire
Maura Caroselli, Esquire

Seton Hall Law School
Center for Social Justice
International Human Rights/Rule of Law Project
833 McCarter Highway
Newark, NJ   07102

Counsel for Amicus-Appellants

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

Nazmi Rranci, a native of Albania, seeks relief from an Immigration Judge's order that he be removed from the United States.  He petitions our Court for review of a decision by the Board of Immigration Appeals dismissing his appeal and declining to reopen his case.  We decide whether the BIA erred in holding that his case cannot be reopened on the ground of ineffective assistance of counsel.  A sub-issue is whether an alien who serves as a Government witness in the United States can be removed to his home country if the person he made a statement or testified against has threatened his life. This raises an issue not addressed before by us — the extent a United Nations Convention recently ratified by Congress affects removal in this case.  We grant the petition and remand to the

3

BIA for further proceedings.

## I. Facts and Procedural History

Rranci paid a smuggling operation to bring him from Albania into the United States. He arrived in Texas in January 2003 after the smugglers had taken him through Italy, Venezuela, Colombia, Ecuador, El Salvador, Guatemala, and Mexico. Shortly after he crossed the border to the United States, the former Immigration and Naturalization Service (now Immigration and Customs Enforcement) detained him. The INS initially served him with a notice to appear in June 2003, after he had begun living and working in New Jersey.

After receiving the notice, Rranci became a material witness in a criminal case against Rustem Muho, a smuggler of illegal immigrants and an alleged chieftain in Albanian organized crime. Rranci had hired Muho to smuggle him into the United States. The U.S. Department of Justice (DOJ) confirmed in writing that Rranci "cooperated with the Government in that he gave a statement regarding the smuggling activities" of Muho and made himself available to testify. Muho eventually pled guilty.[1] The DOJ stated that "Mr. Rranci and

_____

[1] Muho was a significant enough smuggler to merit a DOJ press release on the event of his guilty plea. *See* Press Release, DOJ, Albanian Man Pleads Guilty in Alien Smuggling Conspiracy (May 14, 2003), *at*

4

other material witnesses' cooperation was an important factor in convincing [Muho] to plead guilty."  Letter from Anne Marie Farrar, Trial Attorney, Domestic Security Section, U.S. Dep't of Justice, to Natale F. Carabello, Jr., Esq. (April 4, 2005) (App. at 44) (hereinafter "Farrar Letter").  In order that Rranci could remain in the United States legally while he cooperated with the DOJ, he was paroled through April 2004.  In June 2004, however, once Muho's case was no longer pending and Rranci's parole had expired, the INS served Rranci with a second notice to appear.  It stated that he was subject to removal under § 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(6)(A)(i), for entering the United States without having been admitted or paroled.

In March 2005, Rranci applied for asylum, withholding of removal, and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ("CAT").  As support for his claim of asylum, he stated that he "fear[s] . . . being killed for the reason that I have helped [the United States] against Mr. Muho" and an associate, "who are allied to the Albanian government."  Rranci also alleged that Muho's henchmen had been asking Rranci's family and friends in Albania about his whereabouts.  In a sworn affidavit dated October 31, 2005, Rranci also explained that his understanding

http://www.usdoj.gov/opa/pr/2003/May/03_crm_293.htm (last visited July 28, 2008).

5

from the DOJ was that Muho would be removed to Albania "after about two months" (*i.e.*, two months after his conviction). Thus, Rranci believed that Muho would have returned to Albania by the time he (Rranci) applied for asylum. (In addition, by July 2005, a friend of Rranci's brother told him of spotting Muho in Albania.)

In his October 2005 affidavit, Rranci told of hearsay evidence of the threat against his life. He stated that Muho's brother had communicated a lethal threat against him to a friend's father. Muho's organization might have communicated the threat this way, he conjectured, because his friend's family lived closer and would have been familiar to Muho's crime syndicate. Rranci stated that "Mr. Muho's brother said that I put Rustem [Muho] in jail and that whenever I returned to Albania, Rustem and his friends would kill me."[2]

---

[2] Nothing in the record explains how Muho learned that Rranci had testified against him. *Amici curiae* the Asian American Legal Defense and Education Fund, Frosina Information Network, The International Women's Human Rights Law Clinic of the City University of New York School of Law, the Muslim Bar Association of New York, and the South Asian Bar Association of New Jersey, infer from the record that the Government itself informed Muho, perhaps during plea negotiations, that Rranci had made a statement and would testify against him. *Amici Curiae* Br. at 5. But the record contains no direct evidence that the Government did so.

Rranci alleged in his March 2005 asylum application that the DOJ promised that, if he cooperated with its prosecution of Muho, "a removal proceeding would be waived." In his October 2005 affidavit, Rranci described his understanding of the DOJ's statements slightly differently, stating that the DOJ pledged he "would be protected" and "would not be deported to Albania."[3] He asserted that he would not have cooperated with the Government but for these promises. For its part, the DOJ stated that "Mr. Rranci was not promised that he would be given permanent admission in exchange for his cooperation." Farrar Letter, *supra*.

A hearing before an IJ to decide Rranci's asylum application was scheduled for August 2005. He had hired attorney Natale F. Carabello, Jr. to represent him. During their preparation for the hearing, Carabello told Rranci "that the Court would ask questions for about three hours," suggesting that they had anticipated a full hearing regarding Rranci's asylum application. Nonetheless, before Rranci entered the courtroom, Carabello went in without him and returned with a

---

[3] Rranci's two descriptions of the DOJ's alleged promise stand in tension legally (though perhaps not in a layman's understanding) because declining to remove him to Albania in particular does not foreclose the possibility of removing him to another foreign country. Thus, stating that a removal proceeding will be "waived" is not equivalent to stating he "would not be deported to Albania."

recommendation that Rranci simply accept voluntary departure. In his affadavit, Rranci stated: "The lawyer also told me that I could be arrested if I did not say I wanted to leave. I was afraid. I was forced into taking an agreement to leave the United States because that is what the lawyer told me to do and I was afraid." The Government disputes this characterization, stating that the IJ asked Rranci what he wanted to do and received the response "I want to leave voluntarily." The IJ granted voluntary departure, giving Rranci the opportunity to leave the United States on his own until December 2005. In the alternative, the IJ ordered him removed.

Rather than leaving voluntarily, Rranci obtained new (also his current) counsel and moved to reopen his case in November 2005. He argued that his prior counsel (Carabello) had provided ineffective assistance, which can provide a ground for reopening a case. *See, e.g.*, *Zheng v. Gonzales*, 422 F.3d 98, 106 (3d Cir. 2005). He also argued that the "state-created danger doctrine," which we discuss below, prohibited his removal to Albania. The IJ denied the motion to reopen. Rranci appealed to the BIA, which dismissed his appeal in June 2006. Rranci now petitions our Court for review of the BIA's decision.

## II. Jurisdiction and Standard of Review

We have jurisdiction over final orders of removal under § 242(a)(1) of the INA, 8 U.S.C. § 1252(a)(1). Here, the IJ granted Rranci the option of voluntary departure until December

8

2005 but, in the alternative, ordered him removed to Albania. "An order of removal becomes final upon, *inter alia*, 'a determination by the [BIA] affirming such order.' 8 U.S.C. § 1101(a)(47)(B)(i)." *Yusupov v. Att'y Gen.*, 518 F.3d 185, 195 (3d Cir. 2008). The BIA's dismissal of Rranci's appeal from the IJ's denial of his motion to reopen amounted to an affirmance of the order of removal. *See id.* ("The Supreme Court has specified that administrative orders are final when they mark the 'consummation' of the agency's decision-making process . . . .").

Because the BIA issued an opinion, rather than a summary affirmance, we review the BIA's (rather than the IJ's) decision. *Li v. Att'y Gen.*, 400 F.3d 157, 162 (3d Cir. 2005). We limit our review to the administrative record, 8 U.S.C. § 1252(b)(4)(A), and take the BIA's "findings of fact [as] conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," *id.* § 1252(b)(4)(B). We review the BIA's denial of Rranci's motion to reopen under the abuse of discretion standard. In other words, the BIA's "denial of a motion to reopen may only be reversed if it is 'arbitrary, irrational, or contrary to law.' " *Filja v. Gonzales*, 447 F.3d 241, 251 (3d Cir. 2006) (quoting *Sevoian v. Ashcroft*, 290 F.3d 166, 174 (3d Cir. 2002)). Finally, we review the BIA's legal conclusions *de novo*, including both pure questions of law and applications of law to undisputed facts. *Francois v. Gonzales*, 448 F.3d 645, 648 (3d Cir. 2006).

### III. The State-Created Danger Exception

Generally, due process of law does not create an affirmative obligation for the Government to protect private individuals from other private individuals. But the state-created danger exception to that rule imposes on the Government "a constitutional duty to protect a person against injuries inflicted by a third-party when [the Government] affirmatively places the person in a position of danger the person would not otherwise have faced." *Kamara v. Att'y Gen.*, 420 F.3d 202, 216 (3d Cir. 2005). Rranci argues that the Government, by seeking his cooperation in Muho's prosecution and then ordering his removal to Albania (where Muho, according to the record, resides), has affirmatively placed him in danger. This argument fails as a matter of law. We have stated unequivocally that "the state-created danger exception has no place in our immigration jurisprudence." *Id.* at 217.[4]

---

[4] Rranci tries to distinguish *Kamara* as having different facts, but the section of *Kamara* devoted to the state-created danger exception does not rely on the particular facts of that case. He also argues that *Kamara* concerned a "[c]onstitutional challenge to immigration statutes" rather than an individual constitutional claim. Pet'r's Br. at 17. But the text of *Kamara* belies this attempt at a distinction: "Kamara argues that in addition to misapplying the proper legal standard to his CAT petition the BIA, in issuing its final order of removal, violated *his right* to substantive due process under the state-created danger exception." 420 F.3d at 216 (emphasis added).

Furthermore, *Kamara*'s applicability is beside the point. Procedurally speaking, Rranci's claim that the state-created danger exception should apply to him was not an appropriate ground for a motion to reopen. A pertinent BIA regulation states:

> A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits or other evidentiary material. . . . A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing . . . .

8 C.F.R. § 1003.2(c)(1). Rranci's March 2005 asylum application set out his concerns about the danger waiting for him in Albania as a result of his cooperation with the Government's prosecution of the smuggler Muho. His subsequent October 2005 affidavit accompanying his motion to reopen added some detail, but made no allegation of new facts that arose between the August 2005 hearing before the IJ and the November motion. Thus, Rranci's state-created danger claim did not

11

satisfy the BIA regulation's requirement of "new facts" for a motion to reopen. To reopen his case, Rranci must rely on the allegation that his prior counsel was ineffective.

## IV. Ineffective Assistance of Counsel

Rranci claims that his prior counsel, Carabello, provided him with ineffective assistance at his initial hearing before the IJ in August 2005. In a related argument, Rranci alleges that his acceptance of voluntary departure was not in fact voluntary, because Carabello had frightened him into accepting that form of relief. Our Court has recognized that ineffective assistance of counsel in removal proceedings violates the Fifth Amendment's guarantee of due process of law. *Fadiga v. Att'y Gen.*, 488 F.3d 142, 155 (3d Cir. 2007). We have outlined two sets of requirements, one procedural and one substantive, that claims of ineffective assistance must meet.

## A. Application of *Lozada*'s Procedural Requirements to Rranci's Claim

Our Court has essentially adopted the procedural requirements that the BIA developed for ineffective-assistance-of-counsel claims. *Id.* To proceed with such a claim, the allegedly aggrieved person must (1) provide an affidavit attesting to the relevant facts, (2) inform former counsel of the allegations and allow him an opportunity to respond, and (3) "if it is asserted that prior counsel's handling of the case involved

12

a violation of ethical or legal responsibilities, the motion should reflect whether a complaint has been filed with appropriate disciplinary authorities regarding such representation, and if not, why not." *In re Lozada*, 19 I. & N. Dec. 637, 639 (BIA 1988).

Rranci's motion to reopen easily met the first prong by including the sworn affidavit dated October 31, 2005. Though most of the affidavit focuses on the merits of his asylum claim, the final two paragraphs explain the circumstances of Rranci's acceptance of voluntary departure. The BIA did not mention the first prong, suggesting that it found this requirement to be met as well.

Most of the dispute between the parties focuses on *Lozada*'s second prong. In an attempt to satisfy this requirement, Rranci submitted with his motion to reopen a second affidavit, this time from his current counsel, Rex Chen. In this statement, Chen attested to a conversation he had with Carabello regarding the latter's representation of Rranci at the IJ hearing. Chen informed Carabello that Rranci "was considering a motion to reopen the case to pursue relief under the state created danger doctrine." Chen explained the nature of that doctrine and also relayed Rranci's allegation of intimidation just before entering his hearing before the IJ. In response, according to Chen's affidavit, Carabello stated that he felt it was in Rranci's best interest to accept voluntary departure, denied that he told Rranci he would be imprisoned or detained if Rranci did not depart voluntarily, and conceded that he was unaware of

13

the state-created danger doctrine.

The BIA affirmed the IJ's ruling that Rranci failed to satisfy the second prong of *Lozada*, holding that Chen's affidavit failed to establish that Carabello was aware of any allegations of ineffective assistance. It also stated that no evidence was presented regarding Carabello's opportunity to respond to any such allegations.

We disagree. We have previously warned of the "inherent dangers . . . in applying a strict, formulaic interpretation of *Lozada*." *Xu Yong Lu v. Ashcroft*, 259 F.3d 127, 133 (3d Cir. 2001). *Lozada* "serve[s] as a threshold and a screening mechanism to help the agency assess the substantive number of ineffective assistance claims that it receives." *Fadiga*, 488 F.3d at 155 (internal quotation marks omitted). But it does not specify in detail what constitutes an opportunity for prior counsel to respond. "[B]efore allegations of ineffective assistance of former counsel are presented to the [BIA], former counsel must be informed of the allegations and allowed the opportunity to respond. Any subsequent response from counsel, or report of counsel's failure or refusal to respond, should be submitted with the motion." 19 I. & N. Dec. at 639.

Chen's affidavit satisfied this requirement. It provides evidence that Chen informed Carabello that Rranci was considering a motion to reopen the case and described both arguments pursued before the IJ, the BIA, and our Court. We

14

have no evidence that Chen used the specific words "ineffective assistance of counsel." But he informed Carabello of Rranci's allegation of intimidation, which gave Carabello notice of the substance of Rranci's support for a motion to reopen. The affidavit reflects that Rranci's prior and current counsel discussed their conflicting views of the merits of Rranci's asylum application and the relevant legal theories. In this context, Carabello received adequate notice that Rranci was contemplating an ineffective-assistance-of-counsel claim.

We also conclude that Rranci provided Carabello with an opportunity to respond and submitted his response with the motion. Specifically, Chen's sworn affidavit contains his firsthand account of Carabello's response—that he did not know of the state-created danger doctrine and continued to believe that accepting voluntary departure was the appropriate legal strategy. We acknowledge the BIA's concern that Carabello did not have an opportunity to respond, since he did not provide his own written rebuttal. We agree that a separate response would be ideal. Yet because Chen's affidavit made the BIA aware of the substance of Carabello's response, and our Court has cautioned against a "strict . . . interpretation of *Lozada*," *Xu Yong Lu*, 259 F.3d at 133, we hold that Rranci satisfied *Lozada*'s second prong in this instance.

Rranci concedes that he failed to file a bar complaint. Thus, to satisfy *Lozada*'s third prong, he must explain why he did not pursue disciplinary action against Carabello. 19 I. & N.

15

Dec. at 639. In his motion to reopen, Rranci cited both his lack of English-language skills and time pressure. This excuse is off point, since the filing of a disciplinary action would be an appropriate task for his new counsel, rather than the petitioner himself. Thus, Rranci's difficulty with English and legal standards is irrelevant to the third prong of *Lozada*. Rranci has not provided adequate evidence of his diligence in investigating whether disciplinary action would have been appropriate. *See Zheng*, 422 F.3d at 106. Such diligence, and providing evidence of it to satisfy *Lozada*'s third prong, would have been preferable.

Despite the lack of a compelling excuse for not pursuing disciplinary action against his prior counsel, we still consider Rranci to have satisfied the necessary procedural requirements. Where a petitioner succeeds on the first two prongs of *Lozada* but does not file a disciplinary complaint or provide an explanation, we have held that the third prong does not necessarily sink a petitioner's ineffective-assistance-of-counsel claim. As we explained in *Fadiga*, as long as the policy concerns on which the third prong is based have been served, the complaint requirement may be excused. *See* 488 F.3d at 156–57. In that case, we held that *Lozada* did not bar a petitioner's claim even though the petitioner "neither filed a disciplinary complaint nor explained his failure to do so." *Id.* at 156 (internal quotation marks omitted).

In our case, we are satisfied that the policies underlying

16

*Lozada*'s third prong have been met. These policies include: (1) identifying, policing, and correcting misconduct in the immigration bar; (2) deterring meritless claims of ineffective assistance of counsel; (3) highlighting the expected standards of lawyering for immigration attorneys; (4) reducing the need for an evidentiary hearing; and (5) avoiding collusion between counsel and alien clients. *See id.* We consider these policies in turn.

Rranci submitted enough in his motion to reopen to help his prior counsel avoid the same mistakes in the future. Although an argument based on the state-created danger exception ultimately would have proven fruitless (because we decided *Kamara* three weeks after Rranci's initial IJ hearing), Carabello failed to pursue any legal argument based on Rranci having served as a witness against a prominent, dangerous criminal. For instance, he failed to mention a relevant treaty, the Convention Against Transnational Organized Crime. *See infra* Part V.[5] Awareness of legal doctrines that could provide

_____

[5] Congress had held a public hearing on the treaty in June 2004. *See* Law Enforcement Treaties: Hearing on Treaty Docs. 107-18, 108-6, 108-11, and 108-16 Before the Sen. Comm. on Foreign Relations, 108th Cong. (2004). The Senate Foreign Relations Committee approved the treaty in July 2005, just before Rranci's hearing before the IJ in August 2005. *See Last Week*, Cong. Q. Today, July 29, 2005. A Westlaw search in the Journals and Law Reviews database conducted before Rranci's

17

protection for a Government witness like Rranci might have altered Carabello's strategic decision to recommend voluntary departure. Carabello's phone conversation with Chen made him aware of the shortcomings of his representation by informing him that legal doctrines arguably protecting witnesses do exist. If presented with a similar case in the future, Carabello now has information that will help him to do better. In this context, filing a formal disciplinary proceeding against Carabello is not necessary to advance the policy goal of identifying, policing, and correcting misconduct.

The other policies behind *Lozada*'s third prong have been served here as well. Because of the possibly significant errors Carabello made, *see infra* Section IV.B, we cannot conclude in this particular case that Rranci's claim of ineffective assistance is meritless. The phone conversation between Carabello and Chen has highlighted the need for immigration lawyers to perform research tailored to each client and to keep up with new developments in this fast-changing area of law. That same conversation provides evidence of a key source of the alleged

---

IJ hearing would have uncovered dozens of articles that discuss the treaty and the relevant protocol dealing with human smuggling. *See*, *e.g.*, Bruce Zagaris, *Revisiting Novel Approaches to Combatting the Financing of Crime: A Brave New World Revisited*, 50 Vill. L. Rev. 509, 536–37 (2005) (discussing the treaty and mentioning its provision for the protection of witnesses).

ineffectiveness—Carabello's lack of awareness of legal doctrines that potentially protect witnesses. That evidence reduces the need for an evidentiary hearing about Carabello's representation of Rranci. Finally, there is no suggestion of collusion between Carabello and Rranci.

In sum, although he fell short of the ideal, Rranci has sufficiently addressed the procedural requirements of *Lozada* to proceed with his ineffective-assistance-of-counsel claim.

## B. Application of the Substantive Error-and-Prejudice Test to Rranci's Claim

Ineffective assistance of counsel can constitute a denial of due process if an alien is prevented from reasonably presenting his case. *Xu Yong Lu*, 259 F.3d at 131 (citing *Lozada v. INS*, 857 F.2d 10, 13-14 (1st Cir. 1988)). Our Court uses a two-part test to assess error and prejudice, asking "(1) whether competent counsel would have acted otherwise, and, if yes, (2) whether the alien was prejudiced by counsel's poor performance." *Fadiga*, 488 F.3d at 157 (citations and internal quotation marks omitted).

### 1. Errors by Prior Counsel

Carabello made at least three possible errors that competent counsel may not have made. First, as mentioned above, he had not done enough research to know of the

impending treaty, let alone whether it would apply to Rranci's claim. The record shows that Carabello did inquire at the DOJ to learn about Rranci's cooperation with Muho's prosecutors. Arguably, this should have alerted Carabello to the uniqueness of Rranci's claim and to the need for further research. But it appears that Carabello did not identify any legal theory that might have helped Rranci obtain relief.

Second—even putting aside the allegation of intimidation, which is disputed—Carabello abruptly switched strategies and allegedly left his client confused. Having prepared for a three-hour hearing, Rranci then heard a last-minute recommendation to accept voluntary departure. If Carabello had done the legwork, he would have been prepared. While we do not speculate as to the reasons for Carabello's sudden shift, we nonetheless do not understand why he would recommend on these facts that Rranci forgo a hearing.

Third, Carabello recommended voluntary departure, which is ordinarily understood as a privilege, but may not have benefitted his client in this particular case. The facts that Carabello had collected, the seriousness of the alleged threats Rranci received, the corroboration by the DOJ of Rranci's cooperation, and the overall consistency and plausibility of Rranci's story, suggest that Carabello should have avoided voluntary departure unless it was clear that a country other than Albania would accept him. On this record, we do not know whether Rranci could have departed to a country other than

20

Albania.  Nonetheless, given the peril Rranci appears to face, it is possible that Carabello erred by recommending voluntary departure without knowing if there was any other country in which he was eligible to stay.

In this unique context, we think the possibility of error is strong enough that we remand to the BIA for consideration of whether Rranci's prior counsel erred.  *Fadiga*, 488 F.3d at 161 (noting that our Court has the power to remand a case to the BIA to determine whether an attorney's representation was substantively deficient where the procedural requirements have been met).

## 2. Prejudice

For an alien to demonstrate that he suffered prejudice due to his counsel's unprofessional errors, he must show that there was a "reasonable likelihood that the result would have been different if the error[s] . . . had not occurred."  *Id.* at 159 (quoting *United States v. Charleswell*, 456 F.3d 347, 362 (3d Cir. 2006)) (alteration in original).  An alien "need not show that counsel's deficient performance more likely than not altered the outcome in the case[;] rather, he must show only a probability sufficient to undermine confidence in the outcome.  This standard is not a stringent one." *Id.* at 161 (citations and internal quotation marks omitted) (analogizing to the standard for prejudice in the context of Sixth Amendment ineffective-assistance-of-counsel claims).

21

By accepting voluntary departure at his prior counsel's recommendation, Rranci gave up his claims for asylum, withholding of removal, and CAT protection. Granted, he seems to face an uphill battle on his asylum claim because he has not alleged that he will be persecuted based on "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. § 1101(a)(42)(A) (defining "refugee" status, *i.e.*, eligibility for asylum). No appellate court to our knowledge has deemed "smuggling informants" to be a social group that can serve as a protected ground for an asylum claim. If Rranci's asylum claim is not likely to succeed, then *a fortiori* his claim for withholding of removal is not likely to succeed either. *See Janusiak v. INS*, 947 F.2d 46, 47–48 (3d Cir. 1991) (explaining that withholding of removal requires demonstrating a higher probability of persecution than asylum). We do not, of course, pass judgment on the merits of Rranci's asylum and withholding of removal claims. But for the purpose of evaluating prejudice as part of his ineffective-assistance-of-counsel claim, we focus on CAT protection.

The CAT states that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." CAT art. 3(1). For the purposes of the CAT, torture is defined as pain or suffering "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official public capacity." CAT art. 1(1); *see* 8 C.F.R. § 1208.18(a)(7)

22

("Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity.").

Our Court has explained what constitutes "consent or acquiescence of a public official" for the purposes of protection under the CAT. In *Silva-Rengifo v. Attorney General*, 473 F.3d 58, 64–65 (3d. Cir. 2007), we concluded that the BIA adopted an incorrect legal standard requiring official "consent" or "actual acquiescence," *id.* at 70. "For purposes of CAT claims, acquiescence to torture requires only that government officials remain willfully blind to torturous conduct and breach their legal responsibility to prevent it." *Id.*; *see also Zheng v. Ashcroft*, 332 F.3d 1186, 1197 (9th Cir. 2003) (requiring only awareness and willful blindness of government officials for CAT protection).

The key question in our case is whether a "reasonable likelihood" exists that Rranci could prevail on his CAT claim if his case were reopened. *Fadiga*, 488 F.3d at 159. The BIA held that, in light of *Kamara* and the inapplicability of the state-created danger exception, Rranci had experienced no prejudice. For the reasons discussed in the remainder of this section and in Part V below, we remand to the BIA for another hearing to decide whether Rranci was prejudiced by prior counsel's performance.

To begin, Rranci has not been challenged on credibility

23

grounds. He has provided a consistent account of the threat to his life he faces from Muho and his Albanian crime syndicate. He couples this with an allegation of acquiescence by the Albanian government (an allegation that appeared in his March 2005 application for asylum, withholding of removal, and CAT protection). In his appendix, Rranci included two documents detailing human trafficking in Albania. A BBC News article notes that many of the traffickers in Albania work in collusion with the "underpaid police force, who turn a blind eye to the highly lucrative trade." Claire Doole, *Albania Blamed for Human Trafficking*, BBC News, April 17, 2001, *at* http://news.bbc.co.uk/1/hi/world/europe/1281816.stm (last visited July 29, 2008). A State Department country report on Albanian human rights practices also mentions the problem of police corruption and involvement in trafficking. It goes on to state that victims of trafficking are unwilling to testify "due to fear of retribution from traffickers and distrust of police." U.S. Dep't of State, Albania: Country Report on Human Rights Practices – 2002 at 14 (2003), *available at* http://www.state.gov/g/drl/rls/hrrpt/2002/18349.htm (last visited July 29, 2008). "Lawyers and judges may also be manipulated and bribed, permitting traffickers to buy their way out of punishment if arrested." *Id.*

Based on Rranci's affidavit, the evidence of his cooperation, and the circumstantial evidence of the threat he faces, we cannot say that it is implausible that Rranci will be tortured or killed if he returns to Albania. There may be a

24

"reasonable likelihood" that the pervasive bribery and involvement of various Albanian-government officials would constitute a "willful blindness" to the torturous conduct of a human smuggler like Muho.  Thus, we remand to the BIA for a finding whether Rranci was prejudiced by Carabello's recommendation to forgo a full IJ hearing and accept voluntary departure to Albania.

\* \* \* \* \*

In sum, we hold that Rranci satisfied the procedural requirements of *Lozada*.  Because the BIA erred in applying the law to the undisputed facts of this case, it abused its discretion in dismissing Rranci's appeal and affirming the IJ's denial of his motion to reopen.  We remand for the BIA to consider the substantive aspects of error and prejudice with regard to Rranci's claim of ineffective assistance of counsel in light of this opinion.  *See Fadiga*, 488 F.3d at 161.  If he can demonstrate error and prejudice, then his motion to reopen should be granted and he should receive a new hearing before an IJ on the merits of his claims for relief.

## V. Convention Against Transnational Organized Crime

In closing, we note that Rranci's case presents an issue of first impression for our Court.  He and *amici curiae* raise the issue whether the Government's obligations under protocols of the United Nations Convention Against Transnational

25

Organized Crime, Nov. 15, 2000, 2225 U.N.T.S. 209 ("the Convention"), prohibit his removal. The Convention states: "Each State Party shall take appropriate measures within its means to provide effective protection from *potential retaliation* or intimidation for witnesses in criminal proceedings who give testimony concerning offences covered by this Convention . . . ." *Id.* at art. 24(1) (emphasis added). Annex III to the treaty, the Protocol Against the Smuggling of Migrants by Land, Sea, and Air, is a supplement that is meant to be interpreted together with Annex I (*i.e.*, the main treaty). *Id.* at Annex III, art. 1(1). Offenses under Annex III are viewed as offenses under the Convention as whole, *id.* at Annex III, art. 1(3), and those offenses include the smuggling of migrants, *id.* at Annex III, art. 6(1)(a). Thus, it appears that the witness protections of Annex I would apply to witnesses such as Rranci who provided statements or testified to crimes defined under Annex III of the Convention, here Muho's smuggling crimes.

We did not have the opportunity to address the Convention in *Kamara*, which (as noted above) was decided before the Convention took effect.[6] *Amici* argue that the state-

_____

[6] Congress did not ratify the Convention until October 7, 2005, and it did not take effect in the United States until December 3, 2005. The Government states in its brief that the treaty went into force generally on September 29, 2003. But the State Department points out that "[a] State must become a party to [the Convention] in order to become a party to its Protocols."

26

created danger exception would be an appropriate vehicle to incorporate the Convention's provisions into United States law. We need not reach that issue of treaty interpretation here. But we note that the concept of protecting witnesses under the Convention is distinct from the state-created danger exception. The latter relates to constitutional due process of law, whereas protection under the Convention would come from the United States' treaty obligations. We are skeptical that the state-created danger exception, which extends well beyond the immigration context, can appropriately accommodate the specific obligations of the Convention.

The Government argues that the Convention introduced no new protections for aliens. A Senate report and a letter from President Bush have stated that current United States law already complies with the Convention, obviating the need for any implementing legislation. Gov't's Br. at 15 (citing S. Exec. Doc. No. 109-4, §§ 1(c), 2(c), & 3(c), October 7, 2005; President of the United States, Letter of Transmittal, Treaty Doc. 108-16, February 23, 2004). Accepting that interpretation as accurate, the absence of implementing legislation does not imply that the BIA has no need to set out how existing law

*See* Press Release, U.S. Dept. of State, "Fact Sheet: United Nations Convention against Transnational Organized Crime (TOC)" (Nov. 3, 2005), *a t* http://www.state.gov/r/pa/prs/ps/2005/56006.htm (last visited July 25, 2008).

27

complies with the Convention. On the contrary, it may provide beneficial clarity to alien-informant cases for the BIA to explain its understanding of the United States' obligations toward aliens who provide information in criminal cases.

The Government also argues that Rranci failed to exhaust administratively any claim he might have had under the Convention because he did not raise it in his motion to reopen before the IJ and the BIA. This argument misses the mark. On a motion to reopen, a petitioner claiming ineffective assistance of counsel need not argue the merits of his claims—those will receive a hearing if the petitioner's motion to reopen is successful. *Cf. Fadiga*, 488 F.3d at 163. It cannot be held against Rranci that he failed to raise the issue of a treaty before the IJ and the BIA in that particular procedural context, when the task at hand was to reopen his case.

On remand, the BIA should determine how current U.S. law reflects compliance with the specific provisions of the Convention that are relevant to Rranci's claim. We leave interpretation of this issue to the BIA for consideration in the first instance. *See INS v. Aguirre-Aguirre,* 526 U.S. 415, 425 (1999). But the Convention calls into question whether the Government may put Rranci into harm's way in Albania after using his cooperation to obtain a guilty plea from a significant criminal. The BIA's consideration of the Convention will factor into the degree to which Rranci may have been prejudiced by his prior counsel's decision to recommend forgoing a hearing and

28

accepting voluntary departure.

* * * * *

For these reasons, we grant Rranci's petition for review and remand to the BIA for a new hearing on the substantive components (error and prejudice) of his ineffective-assistance-of-counsel claim consistent with this opinion.