**Asdrubal C. RINCON; Luz M. Villegas, Petitioners**

v.

**ATTORNEY GENERAL OF the UNITED STATES, Respondent.**

No. 08–1752.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) Dec. 16, 2009.

Filed: Jan. 11, 2010.

Regis Fernandez, Esq., Newark, NJ, for Petitioners.

Sharon M. Clay, Esq., Richard M. Evans, Esq., United States Department of Justice Office of Immigration Litigation, Washington, DC, for Respondent.

Before: RENDELL, FISHER and GARTH, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM.

Asdrubal Cardenas Rincon and Luz Miriam Ossa Villegas, husband and wife, are citizens of Colombia who were charged with removability for entering the United States without valid entry documents. *See* Immigration and Nationality Act ("INA") § 212(a)(7)(A)(i)(I) [8 U.S.C. § 1182(a)(7)(A)(i)(I) ]. Rincon conceded removability, but applied for asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT").[1] Rincon claimed that he was persecuted in Colombia by the Nation-

---

1. Although this opinion will refer to the lead petitioner, Rincon, it should be understood to include Villegas' derivative application as well. *See Al–Fara v. Gonzales,* 404 F.3d 733, 736 n. 1 (3d Cir.2005).

al Liberation Army ("ELN"), a terrorist organization, because he worked with the Liberal Party to provide medical care to victims of the guerillas. Rincon alleged that the ELN threatened him with death multiple times beginning in May 1999. Scared by the threats, Rincon and his wife departed for the United States. Rincon claimed that he returned to Colombia in November 2001 after learning that his father had suffered a heart attack. Back in Colombia, the ELN allegedly attempted to kill him. According to Rincon's testimony, he was riding a motorcycle at 10 p.m. on February 13, 2002, when a man exited a car and fired a gun at him. After driving around town to make sure he was not being followed, Rincon went to his parents' house. When Rincon arrived, his father received a telephone call from someone identifying himself as a representative of the ELN, warning that while Rincon had escaped this time, he would not be "saved" the next time. Rincon testified that he reported the incident to the police the next day, but that he was not sure whether they investigated. Fearful for his life, Rincon departed again for the United States on February 17, 2002.

The Immigration Judge ("IJ") denied relief, finding that Rincon's account of the February 13, 2002, attempt on his life was not credible because of inconsistencies in his written applications, his testimony, and documentary evidence. The IJ also cited his failure to provide reasonably expected corroboration. The Board of Immigration Appeals ("BIA") affirmed without opinion. Rincon filed a petition for review, and we granted the Government's unopposed motion to remand the case to the Board to reassess whether the IJ's adverse credibility determination was supported by the record. *See Rincon, et al. v. Att'y Gen.*, 06–4136 (order entered on April 23, 2007). On remand, the BIA analyzed the record and concluded that the IJ's credibility determination was not clearly erroneous.[2] Rincon filed a timely petition for review.

We have jurisdiction under INA § 242 [8 U.S.C. § 1252]. Because the BIA adopted the findings of the IJ and also commented on the sufficiency of the IJ's determinations, this Court reviews the decisions of both the BIA and the IJ. *See Kaita v. Att'y Gen.*, 522 F.3d 288, 296 (3d Cir.2008). Our review of these decisions is for substantial evidence, considering whether they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Lin–Zheng v. Att'y Gen.*, 557 F.3d 147, 155 (3d Cir.2009) (en banc) (quotation marks

2. The Board also rejected Rincon's request to remand the matter to the IJ for consideration of evidence allegedly demonstrating ineffective assistance of counsel and establishing his status as a health care worker. The Board's decision was based in part on Rincon's perceived failure to comply with the procedural requirements established by *Matter of Lozada*, 19 I. & N. Dec. 637, 639 (BIA 1988).

We have generally approved the application of the *Lozada* procedural requirements to claims of ineffective assistance of counsel in removal proceedings. *See Fadiga v. Att'y Gen.*, 488 F.3d 142, 155 (3d Cir.2007). However, we have modified *Lozada* to excuse strict compliance with its requirements under particular circumstances. *See id.* at 157 (alien was excused from explaining his failure

to file a disciplinary complaint against allegedly ineffective counsel because counsel freely admitted his ineffectiveness); *see also Rranci v. Att'y Gen.*, 540 F.3d 165, 172–73 (3d Cir. 2008).

The BIA decision does not specify—and we are unable to clearly discern from the record—the particular *Lozada* requirement with which Rincon failed to comply. We are therefore unable to meaningfully review the BIA's application of those requirements to Rincon. The Board, in reviewing upon remand Rincon's evidence that he was targeted by the ELN because he was a health-care worker, should reconsider Rincon's ineffective-assistance claim in light of our ruling and our cases modifying *Lozada*.

and internal citation omitted). We will uphold an adverse credibility determination under the substantial evidence standard " 'unless any reasonable adjudicator would be compelled to conclude to the contrary.' " *Lin v. Att'y Gen.*, 543 F.3d 114, 119 (3d Cir.2008) (internal citation omitted). Adverse credibility determinations based on speculation or conjecture, rather than on record evidence, are reversible. *See Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir.2002). Furthermore, we must uphold a determination regarding the availability of corroborating evidence unless "a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable."[3] INA § 242(b)(4) [8 U.S.C. § 1252(b)(4) ]; *see also Sandie v. Att'y Gen.*, 562 F.3d 246, 252 (3d Cir.2009).

■ The adverse credibility determination centered on allegedly differing accounts of the ELN's efforts to kill Rincon on February 13, 2002. The record contains a police report, prepared the day after the shooting, which contains the following account:

> [A]t aroun[d] 10:00 PM in the evening, I was in the sector of Cali in the Alto Refugio neighborhood[.] I was [driving] my father['s] motorcycle on Carrera 67 between [S]econd and [T]hird [S]treet, when a Renaul[t] car appeared[.] I cannot say the plate numbers nor the color since it was very dark[.] [F]rom there a person fired at me with a weapon[.] I was able ... to keep the motorcycle balance[d] and fortunately the shot did not reach me. . . . [The car] took a different direction[.] I was going to my parent[s'] house whose address is the same where I live.

Administrative Record ("A.R."), 528. The IJ concluded that this story "varie[d] significantly" from Rincon's testimony that he was shot at twice and the Renault was parked at the time of the shooting. We disagree. Rincon provided reasonable explanations for both of these perceived inconsistencies. For instance, Rincon explained during his testimony that he "didn't tell [the police] about the second shot ... because I didn't see it and at the that time I omitted it." A.R. 374. Indeed, earlier in his testimony, Rincon stated that "I only heard a second shot but I did not see [it]."[4] A.R. 303. When asked to explain why he had told the police that the Renault was moving, Rincon stated, "when I made the report, I saw the car, which was moving, and then it stopped. I said that the car had come out. . . . He came out and then he stopped and somebody then got out of the car." A.R. 373. This account corresponds with Rincon's earlier testimony that "a car parked, exited and parked. As I approached, somebody exited the vehicle." A.R. 301. The explanation also is consistent with Rincon's asylum interview and an addendum attached to his first asylum application, in which Rincon stated, respectively, that "someone came out of the car" and that "a man came out of a dark Renault that was parked across the street." A.R. 482, 522–23. Notably, the IJ failed to acknowledge either of Rincon's explanations for the alleged discrepancies. In any event, they represent minor inconsistencies in Rincon's description of a traumatic event. *Cf. Cham v. Att'y Gen.*, 445 F.3d 683, 691 (3d Cir.2006) (criticizing IJ for concluding that a "traumatic

---

3. The provisions of the Real ID Act of 2005 that address the Court's review of an adverse credibility finding do not apply in this case because Rincon applied for relief before the Act's effective date. *See Chukwu v. Att'y Gen.*, 484 F.3d 185, 189 (3d Cir.2007).

4. We note that when Rincon was asked how many times he was fired at, the IJ commented, "I wouldn't expect anybody to ... sit and take notes." A.R. 303.

event" would be "forever seared in [the petitioner's] memory").

The adverse credibility determination also rested on discrepancies in Rincon's account of his escape. In both his asylum interview and in the asylum application addendum, Rincon stated that he went to a friend's house before returning to his parents' home. A.R. 482, 523. Although Rincon did not mention going to a friend's house in his testimony, he did state that he did not immediately return to his parents house because he was afraid that he was being followed. A.R. 376–78. Notably, the IJ acknowledged that she "overlooked [her] obligation to ask [Rincon] to explain this discrepancy." *See Ming Shi Xue v. BIA*, 439 F.3d 111, 125 (2d Cir.2006) (holding that "an IJ may not rest an adverse credibility finding on non-dramatic putative contradictions or incongruities in an alien's narrative without first giving the applicant a chance to reconcile the testimony"). The asylum addendum also indicated that Rincon went to his parent's house two hours after the shooting, but he testified that it "was in a half hour that I got home." A.R. 357. We conclude that these inconsistencies are minor and do not support an adverse credibility determination, particularly in light of Rincon's otherwise consistent account.[5]

Further, substantial evidence does not support the BIA's conclusion that Rincon was unable to remember reporting the shooting incident to a human rights office. In addition to the police report, which indicated that it was made at 10:00 a.m. on February 14, 2002, the record also contained a statement from the Human

Rights Chief at the Security Administrative Department ("DAS"), noting that Rincon appeared there at 3:00 p.m. on February 14 to "request help due to the death threats and psychological terrorism." A.R. 415. The IJ asked Rincon, "[d]id you go to more than one office to file a complaint the day after the shooting?" Rincon explained, "I didn't consider them to be two offices. I went to the police and the DAS. . . . I consider them the same office. I went to both places but I didn't think of one being different than the other. For me it's the same office." A.R. 380. We also perceive no inconsistency in the 5–hour difference between the reports. Indeed, Rincon's description of going to the police in the morning is supported by the Human Rights Chief's statement that Rincon "presented [a] copy of the complaint submitted to the metropolitan police" when he appeared in the DAS office at 3:00 p.m. A.R. 415.

The BIA also agreed with the IJ that Rincon failed to establish that he was in Colombia from November 2001 to February 2002.[6] In particular, the BIA stated that the "police and human rights complaints were not authenticated and are not reliable evidence of [Rincon's] presence in Colombia on February 14, 2002, in light of the inconsistencies between [his] testimony and the police complaint, and his vague testimony regarding his visit to the human rights office." We have already rejected the BIA's reasoning concerning the alleged inconsistencies. With respect to authentication of the documents, we emphasize that the IJ specifically stated that she was

---

5. For instance, Rincon consistently maintained that the attack occurred at 10:00 p.m. on Route 67, between Second and Third Streets, that the car from which the shooter emerged was a Renault, and that his parents received a threatening telephone call shortly after the shooting. A.R. 301, 304, 373, 522–23, 528.

6. The IJ also faulted Rincon for providing "peculiar new added details (including [his] sudden claim that his parents have received phone calls about [him] since his return here in 2002)." A.R. 205. Given that the family may have received the phone calls after Rincon filed his asylum application, it is unclear why such evidence was "peculiar."

"rel[ying] on documents presented by [Rincon] in support of [his] claims, despite their not being authenticated." The IJ noted that it was "impossible" for Rincon to attempt to authenticate the documents because the Government did not return the documents to Rincon's counsel with such a request. The Board offered no explanation for its decision to hold the lack of authentication against Rincon. *Cf. Liu v. Ashcroft,* 372 F.3d 529, 533 (3d Cir.2004) (holding that failure to properly authenticate a document is not an absolute rule of exclusion).

For the foregoing reasons, we will grant the petition for review, vacate the BIA's order of February 20, 2008, including that portion of the order which denied Rincon's motion to remand on futility grounds, *see* footnote 2, *supra,* and remand for further proceedings consistent with this opinion.