NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

———

No. 09-2777

———

SERBAN ANDREI VALCU,
                    Petitioner
v.

ATTORNEY GENERAL OF THE UNITED STATES,
                    Respondent

———

On Petition for Review of an Order
of the Board of Immigration Appeals
(No. A097-902-790)
Immigration Judge: Hon. R. K. Malloy

———

Submitted Under Third Circuit LAR 34.1(a)
September 17, 2010

Before:  SLOVITER, BARRY and SMITH, Circuit Judges

(Filed: September 20, 2010)

———

OPINION

———

SLOVITER, *Circuit Judge*.

Serban Andrei Valcu ("Serban") has filed a petition for review of the order of the Board of Immigration Appeals ("BIA") denying his application for asylum under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(b).

**I.**

Serban, who was approximately seventeen or eighteen years old, entered the United States in September 2004 after paying to be smuggled over the Mexican border along with his older brother, Bogdan Daniel Valcu ("Bogdan"), and his brother's partner, George Valentin Ionescu ("George"). All three were subsequently subject to removal proceedings. They conceded removability for entering the United States without having been admitted or paroled, and each applied for asylum and withholding of removal under the INA and the Convention Against Torture ("CAT"). A joint hearing was held and their applications were considered simultaneously by the Immigration Judge ("IJ").

Bogdan testified he had suffered past persecution, and feared future persecution, in Romania because he is gay. He described the "problems he had [in Romania as including] beatings, cursings, [inability] to find a steady job, and . . . problems at school." A.R. at 108. George, Bogdan's partner, testified that he suffered similar assaults and poor treatment. They stated that the police were unwilling to assist them, and in fact attacked both men on an occasion when they requested police help.

Petitioner Serban testified that his father left Romania in 2001, that his mother left

in 2003, and that both came to the United States. When his mother left, Bogdan was away at college and would return home on the weekends, and Serban would take meals with neighbors and either stay with them or at his family home. Serban testified that he is not gay, but beginning in 1999, when he was twelve or thirteen years old, his classmates began beating him after learning that his brother Bogdan is gay. These beatings occurred both inside and outside of school, and continued until he left for the United States. Additionally, Serban's mother, who was a teacher at his school, told Serban that his teachers were giving him low grades because of Bogdan, and Serban's family had to bribe his teachers in order for him to pass his classes. Serban testified that school officials were apparently unwilling to help him, and that it would have been pointless to go to the police.

Serban also testified that if he returned to Romania he would have the "[s]ame problems" given that "everybody knows about me" in the town of Urzceni where he grew up. A.R. at 260-61. When asked if he could move in with his grandparents, who resided in a different region of Romania than Serban's hometown, Serban answered, "[n]o," because, "[t]he same mentality [towards gays] is everywhere throughout the country." A.R. at 261. However, in response to a question whether he preferred to be in Romania, he replied, "[y]es, if my brother wasn't gay." A.R. at 274.

The IJ found that Bogdan and George "testified credibly that they suffered beatings, cursings, humiliation, inability to find steady employment, and school

3

problems" because of their sexual orientation.  A.R. at 148-49.  The IJ determined that in light of the serious levels of discrimination against gay persons in Romania, Bogdan and George suffered past persecution and would likely suffer future persecution on account of their sexual orientation if they returned, and thus granted their applications for asylum.

In contrast, the IJ denied Serban's application, explaining that Serban had not "suffered past persecution on account of his membership in a particular social group or any other grounds, . . . [and that] Serban [would not] . . . suffer future persecution on account of any of the enumerated grounds" because "[i]f Serban were to return alone to Romania, he should be able to escape the stigma of his brother's homosexual status." A.R. at 150.  The IJ did not address Serban's applications for withholding of removal.

The BIA dismissed Serban's appeal.  Although the BIA assumed, without deciding, that Serban's testimony was credible, and held that "[a] family may constitute a particular social group,"[1] it held that Serban had failed to show either "[1] that other members of his family were targeted by his attackers on account of their relationship to his brother or [2] that he himself was attacked due to his relationship to his brother rather than due to a desire on the part of the attackers to punish his brother." A.R. at 4-5 (citation omitted).  Alternatively, the BIA held that even if it were to assume former persecution, "any presumption of future persecution is rebutted by the fact that [Serban]

---

[1] The Government does not contest on appeal that Serban's family constitutes a "social group" under 8 U.S.C. § 1101(a)(42)(A).

4

now would return to Romania without his brother." A.R. at 5 (citing 8 C.F.R. §

208.13(b)(1)(i)(A) (presumption of future persecution can be rebutted by showing of "a

fundamental change in circumstances")). Finally, the BIA held that Serban did not

"offer[] any information on appeal to establish that he was prejudiced by the lack of an

explicit determination on his eligibility for withholding of removal under the" INA or the

CAT. A.R. at 5. Serban timely petitioned this court for review.

## II.[2]

"Because the BIA issued an opinion, rather than a summary affirmance, we

review the BIA's (rather than the IJ's) decision." *Espinosa-Cortez v. Att'y Gen.*, 607 F.3d

101, 106 (3d Cir. 2010) (citation and internal quotation marks omitted). "We affirm any

findings of fact supported by substantial evidence and are 'bound by the administrative

findings of fact unless a reasonable adjudicator would be compelled to arrive at a contrary

conclusion.'"[3] *Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009) (quoting *Yan Lan

Wu v. Ashcroft*, 393 F.3d 418, 421 (3d Cir. 2005)). "[W]e review the BIA's legal

conclusions *de novo*, including both pure questions of law and applications of law to

---

[2] We have jurisdiction under 8 U.S.C. § 1252(a)(1).

[3] Whether, for asylum purposes, a petitioner has proven that he or she has a well-founded fear of persecution "is a question of fact . . . ." *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 340 (3d Cir. 2008) (citing *Lukwago v. Ashcroft*, 329 F.3d 157, 167 (3d Cir. 2003)). Similarly, a determination of the future probability of persecution is also a fact. *Cf. Kaplun v. Att'y Gen.*, 602 F.3d 260, 271 (3d Cir. 2010).

5

undisputed facts." *Rranci v. Att'y Gen.*, 540 F.3d 165, 171 (3d Cir. 2008) (citing

*Francois v. Gonzales*, 448 F.3d 645, 648 (3d Cir. 2006)).

An applicant can qualify for asylum as a refugee if he or she proves "past

persecution . . . ." 8 C.F.R. § 208.13(b); *see also id.* § 208.13(a). If an applicant does so,

a presumption arises that if returned to his or her country of origin, the applicant will

again be persecuted. *See id.* § 208.13(b)(1). The Government can rebut that presumption

by showing by a preponderance of the evidence that "[t]here has been a fundamental

change in circumstances such that the applicant no longer has a well-founded fear of

persecution in the applicant's country of nationality . . . ." *Id.* § 208.13(b)(l)(i)(A); *see*

*also id.* § 208.13(b)(1)(ii).

The BIA's conclusion that Serban failed to establish a nexus between the attacks

on him and his brother's sexual orientation because Serban did not testify that his

attackers targeted his other family members is not supported by substantial evidence.[4]

---

[4] The Government argues that Serban failed to establish a nexus between his familial membership and his persecution "absent . . . any indication that the students [who attacked Serban] mentioned Serban's brother, let alone his brother's sexuality, when he was harmed." Appellee's Br. at 24-25. However, neither the IJ nor the BIA employed this rationale. Serban – who apparently was never asked by the Government if his attackers made such representations – has consistently asserted conclusive knowledge that he was attacked because of his brother's sexual orientation. As the BIA assumed Serban's credibility, we have little basis to question that assertion, which was corroborated by Bogdan's testimony, *see* A.R. at 203, was supported by statements Serban attributed to his mother, *see* A.R. at 254-55, and which flows

6

Serban testified that it was his classmates who attacked him. It is unsurprising that Serban's classmates, who during the relevant times would have been from about thirteen years of age to about seventeen years of age, would not have attacked Serban's father who was a grown man, Serban's mother, who was a teacher at Serban's school, or Serban's brother, who was older. Indeed, Serban's mother and brother were harassed by their own peer groups, as Serban was by his.

We are unpersuaded by the BIA's reasoning that because Serban failed to present evidence that the beatings he suffered were committed out of anything other than a "desire on the part of the attackers to punish" Bogdan, A.R. at 5, Serban failed to show that the beatings were "on account of" Serban's membership in the family group, 8 U.S.C. § 1101(a)(42)(A). Such attacks were obviously committed "due to [Serban's] relationship to his brother." A.R. at 4-5. Indeed, the familial relationship was the basis for the attacks. Neither the BIA nor the Government has offered a principled explanation for the BIA's contrary conclusion.

On the other hand, we conclude that there is ample basis to uphold the BIA's finding that the presumption arising from Serban's past persecution was rebutted by the fact that, as Bogdan testified, Serban would be returning to Romania alone, as Bogdan testified he would not return if granted asylum. Thus, there has been a "fundamental

logically from the description provided by Serban and Bogdan of the conditions in their small town, as well as the country conditions that the IJ found exist in Romania generally.

7

change in circumstances" within the meaning of 8 C.F.R. § 208.13(b)(1)(i)(A). Serban has graduated from high school and when he returns to Romania he will be about twenty four years old. There was no evidence presented that as an adult Serban will suffer the same level of persecution that he did as a child. These facts, without countervailing evidence submitted by Serban, constitute sufficient evidence to support the BIA's determination that the presumption of future persecution has been rebutted.

Although the IJ did not reach Serban's other claims, the BIA held that this same reasoning precludes withholding relief under both the INA, which requires a higher standard of proof than a grant of asylum, and under the CAT, which requires a finding of a future probability, i.e., over a fifty percent chance, of torture. *See Gambashidze v. Ashcroft*, 381 F.3d 187, 191 (3d Cir. 2004); 8 C.F.R. § 208.16(c)(2); *Auguste v. Ridge*, 395 F.3d 123, 149 (3d Cir. 2005).

Serban's due process claim fails because in cases other than those implicating fundamental rights, an appellant must show prejudice in order to establish a violation. *See Leslie v. Att'y Gen.*, --- F.3d ----, 2010 WL 2680763, at *2 (3d Cir. 2010) ("allegations of due process violations must ordinarily be accompanied by an initial showing of substantial prejudice . . . ." (citation and internal quotation marks omitted)). Serban has failed to do so here.

### III.

### Conclusion

8

For the reasons set forth above, we will deny Serban's petition for review.