[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 17-15245; 18-12162
_____

Agency No. A 209-134-539


HAMID SOW,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petitions for Review of a Decision of the
Board of Immigration Appeals
_____

(February 14, 2020)

Before WILSON and NEWSOM, Circuit Judges, and COOGLER,* District Judge.

WILSON, Circuit Judge:

---

* The Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

Hamid Sow, a citizen of Guinea, seeks review of the Board of Immigration Appeals' (BIA) denial of his motion to remand based upon ineffective assistance of counsel and motion to reopen based upon new evidence.  After careful review and with the benefit of oral argument, we conclude that the BIA abused its discretion in denying Sow's motion to remand based on ineffective assistance of counsel.  We therefore grant Sow's petition for review, vacate the BIA's decisions, and remand to the BIA with instructions to remand to the IJ for reconsideration of Sow's asylum application.[1]

## I.    Factual and Procedural Background

### A. Underlying Facts

In December 2016, Sow entered the United States and immediately applied for asylum based on his membership in a particular social group—the homosexual community.  His application for asylum alleged the following.

Sow was raised in Conakry, Guinea where he had to hide his sexuality because of the stigma against homosexuals in his devout Muslim community.  For the same reason, he had to hide his relationship with a man named Alpha Oumar Barry.  When Sow's sister discovered the true nature of Sow and Alpha's[2]

---

[1] Because we are granting relief based on Sow's ineffective assistance of counsel claim, we decline to address his motion to reopen based on new evidence.

[2] Multiple individuals involved in this case—none of whom are related—have the last name Barry.  We therefore refer to these individuals by their first names.

relationship, Sow immediately fled his house for fear that his uncle, a prominent Iman, would kill him. While he was in hiding, a friend informed Sow that his family and other members of the community had tortured and then burned him alive. His friend also reported that Sow's uncle had instructed the community members to, once found, either kill Sow or turn him into the police for failing his family and the laws of Islam.

Sow fled to Morocco, where he intended to stay with a cousin. But by the time he arrived at his cousin's house, his cousin had learned of Sow's sexuality. As a result, he brutally beat Sow. A taxi driver found Sow and took him to a hospital, but the hospital staff refused to treat Sow because of his sexuality. The taxi driver then took him to a friend's home. The driver's friend cared for Sow for nearly six months while he recovered from his injuries. He then helped Sow obtain a Mexican visa.

Shortly after arriving in Mexico, Sow traveled to the United States. He presented himself at the United States border on December 23, 2016, where he informed an officer of his fear of returning to Guinea because he was a homosexual.

### B. Representation and Merits Hearing

While detained, Sow was in contact with two friends: Ibrahim Barry and Aminata Diallo. Ibrahim reached out to an attorney, Joseph Gurian, on Sow's

behalf.  Gurian agreed to represent Sow.  Ibrahim and Diallo then began to gather evidence for Gurian to use in support of Sow's asylum application.

Shortly after Gurian agreed to represent Sow, Sow began calling Gurian. Sow, who speaks only French, had to rely on other detainees to help him communicate with Gurian, who speaks only English.  After a couple unproductive calls, Gurian informed Sow that he would secure a French interpreter.  Gurian also asked Sow to send him documents related to Sow's case.  Sow asked if Gurian would meet with him at the detention center, but Gurian refused.  Sow then sent Gurian his asylum application and a statement detailing his fear of returning to Guinea.

A few days later, Sow called Gurian and, again relying on other detainees to translate, requested copies of the documents that Ibrahim and Diallo had collected on his behalf.  Sow did not receive any documents.[3]  During their next call, Sow again requested access to the evidence so that he and Gurian could discuss his case. Gurian told Sow that he would obtain an interpreter and call back at a particular time so they could discuss his case.  Gurian did not call at the arranged time. Gurian later admitted that he missed the call because the interpreter cancelled.

---

[3] Gurian later told Sow that he had indeed mailed the documents, but there is no evidence to support this statement.

Gurian eventually visited the detention center, but the visit lasted only thirty minutes and there was no interpreter present.  The only evidence that Sow was able to review was an affidavit written by Sow's aunt, Oumou Hawa Barry.  Sow tried to communicate that Oumou is forgetful and that she was unfamiliar with the events leading to his displacement.  He described her statement as "no good."  But without a translator, Gurian did not fully understand Sow's concerns.  According to Sow, Gurian "dismissed" him, told him the letter "was good," and informed him that he would "not get a chance to review the rest of the evidence."  Gurian then gave Sow a questionnaire written in both English and French and asked him to draft a new statement based on his answers.

Sow answered the questionnaire, relying on other detainees to translate his responses to English.  A few days later, Gurian picked up the statement, but did not review it with Sow.  Sow requested another meeting so he could review the evidence.  Gurian eventually agreed to meet with Sow once more before the merits hearing.  The meeting, again conducted without an interpreter, lasted only twenty-five minutes.  Gurian neither brought any of the evidence for Sow to review nor discussed the substance of the case with Sow.

Sow and Gurian did not meet again until thirty minutes before the merits hearing.  Gurian again failed to bring an interpreter.  During this meeting, Sow finally had the opportunity to briefly review the two affidavits submitted by his

friend, Djibril Barry.  Sow tried to communicate to Gurian that the content of the affidavits "did not match up with what happened" and that the dates of the same events listed in Djibril's two affidavits were inconsistent.  But because there was no interpreter present, the message was not properly relayed.  Sow attempted to express his concerns in English, telling Gurian "[t]his evidence is no good."  But Gurian dismissed his concerns.  Sow also stated that Gurian did not prepare him for direct or cross-examination, and that he did not even know a government lawyer would be present until the hearing began.

Before Sow's merits hearing, Gurian submitted the following evidence: the State Department's 2016 Guinea Human Rights Report, a news article describing lynchings targeting homosexual people in Conakry, two photographs allegedly showing Alpha's dead body, Diallo's affidavit, and two affidavits each from Djibril and Oumou.

At the beginning of the hearing, the Immigration Judge (IJ) noted that Sow submitted two applications for asylum.  He asked Gurian which application Sow intended to rely on.  Gurian responded that he did not know that Sow had submitted two applications.  When the IJ noted that the second was more detailed, Gurian said that he "imagine[d]" that was the one Sow wanted to move forward with.

6

During his testimony, Sow detailed his experience in Guinea. He testified that he and his homosexual friends were persistently persecuted, that his friend was killed in 2009 for being homosexual, and that other homosexual friends had been imprisoned. He said that he had been in a relationship with Alpha for six years and that they were first persecuted for being homosexual in April 2015 when a neighbor told the police that she saw them kissing. The police charged Sow with engaging in homosexual activity, which is illegal in Guinea, and jailed him. While visiting him in jail, his uncle beat Sow. After two months in jail, Sow swore to his uncle that he was not homosexual, and his uncle eventually secured his release.

Sow further testified that in May 2016, Sow's sister discovered explicit pictures of Alpha and Sow, exposing their relationship. Sow fled. He later learned that his family and members of the community apprehended Alpha, tortured him, and then burned him alive.

On cross-examination, the government asked Sow to explain inconsistencies in Djibril's two affidavits.[4] Sow responded that he could not explain the inconsistencies because he had not had an opportunity to read the affidavits.

---

[4] The inconsistencies were glaring. In one affidavit, Djibril's account of Alpha's death tracked Sow's account. But the other affidavit describes a wholly separate incident. Djibril said Alpha was killed months after Sow's family discovered the true nature of Alpha and Sow's relationship. According to this second affidavit, Alpha died after a man punched him while he and Sow were walking in the streets of Conakry.

7

Gurian stated that he believed there were two individuals named Djibril Barry.

Sow had to correct Gurian and confirm there was only one.

In his oral decision, the IJ said that he "unfortunately" had to deny Sow's

application based solely on an adverse credibility finding. In coming to this

conclusion, the IJ specifically highlighted the inconsistencies in Djibril's and

Oumou's statements. He noted that, if it were true that Sow were a homosexual,

then he "clearly should get" asylum. Likewise, he said "if [Sow was] telling the

truth I would in a heartbeat grant him asylum."

*C. Merits Appeal and Motion to Remand*

Sow, represented by new counsel, appealed to the BIA. He argued that the

IJ erred in failing to assess Sow's well-founded fear of future persecution. Sow

also filed a motion to remand based on ineffective assistance of counsel,[5] which

included several attachments. For example, he attached an affidavit from Djibril

explaining the inconsistencies in his previous affidavits, both of which Gurian

submitted to the IJ. It stated that Djibril had intended to send only his second

affidavit and that the earlier version had been written by his younger brother, who

had helped write the statement while Djibril was hospitalized. When Djibril was

discharged, he noticed the mistakes and sent a corrected affidavit. Djibril also

---

[5] Sow styled his motion as a "motion to reopen and remand," but we construe it as a motion to remand because he filed the motion while his appeal to the BIA was pending. *See* 8 C.F.R. § 1241.1.

stated that he had tried to help Oumou draft her affidavit. He characterized Oumou as "not very well" and noted that she "forgets things."

Sow also attached an affidavit from Ibrahim. Ibrahim stated that, when he was gathering evidence, he noticed inconsistencies in the affidavits and informed Gurian of those inconsistencies. Gurian dismissed his concerns. Despite the warning, Ibrahim thought Gurian seemed surprised about the inconsistencies when they spoke after the merits hearing. When Ibrahim asked whether Gurian had even read the evidence before the hearing, Gurian said he had not had much time to review the documents.

Sow also attached an email chain between Ibrahim and Gurian from March 2017. In the emails, Ibrahim offered to serve as the interpreter and asked Gurian the dates and times he needed to be available. Gurian never responded with a proposed date.

The BIA denied Sow's motion to remand. It held that the IJ did not clearly err in making an adverse credibility determination and the record did not establish that Sow was entitled to relief "independent of his discredited claim of past harm." It also denied Sow's ineffective assistance of counsel claim, reasoning that Gurian "reasonably relied on, and submitted the evidence provided by, the respondent and his friends." According to the BIA, "submitting evidence that [Sow] was involved in collecting" did not "render[] [Gurian's] performance ineffective."

9

*D. Motion to Reopen*

Two months later, Sow filed a motion to reopen based on new evidence.  He attached a Guinean arrest warrant that was issued on June 14, 2017.  The warrant states that Sow was caught having "carnal relations" with a friend in his Conakry home and his friend was then "beaten, burned, and immediately surrendered of his spirit."  The warrant also states that Sow's family requested that a warrant be issued for his "acts of homosexuality, and of indecent assault on the good traditions that harm the reputation of an African family" in violation of Articles 267, 271, and 277 of the Guinean Criminal Code.  Sow also attached an affidavit prepared by Ibrahima Sory Barry, a member of the Guinean National Police Force. Ibrahima verified the validity of the warrant and stated that if Sow returned to Guinea, it would be his duty to arrest him.

The BIA denied Sow's motion to reopen, reasoning that "[t]he new evidence submitted does not address the grounds of adverse credibility finding [sic], and therefore does not show that a different outcome may be warranted."

Sow timely appealed both the BIA's denial of his motion to remand based on ineffective assistance of counsel and its denial of his motion to reopen based on new evidence.[6]  This is his consolidated appeal.

---

[6] Sow also argues that "[i]f [we do] not grant relief on Mr. Sow's ineffective assistance claim, [we] should nonetheless remand for the more limited purpose of requiring the BIA to assess Mr.

## II.    Ineffective Assistance of Counsel

Sow contends that the BIA erred in denying his motion to remand based on ineffective assistance of counsel.  He argues that that his counsel acted deficiently by not (1) communicating with him about the substance of his case; (2) allowing Sow to review the evidence despite Sow's repeated requests; and/or (3) adequately preparing for the merits hearing.  Sow further maintains that these deficient acts were prejudicial because, if Gurian had fulfilled his basic obligations, he would not have submitted the flawed affidavits that were the basis for the adverse credibility finding.  The government did not address the ineffective assistance of counsel claim.

Where, as here, a motion to remand seeks additional proceedings to introduce additional evidence, we apply the same standard of review as a motion to reopen.  *See Najjar v. Ashcroft*, 257 F.3d 1262, 1301 (11th Cir. 2001).  We review the BIA's denial of a motion to reopen for abuse of discretion, limiting our review to "determining whether there has been an exercise of administrative discretion and whether the matter of exercise has been arbitrary or capricious."  *Ali v. U.S. Att'y Gen.*, 443 F.3d 804, 808 (11th Cir. 2006) (per curiam) (quotation omitted).  Where, as here, the BIA adopted the IJ's decision or reasoning, we review both the BIA's

---

Sow's fear of future persecution."  Because we remand based on Sow's ineffective assistance claim, we need not consider this alternative ground for relief.

11

and the IJ's decisions. *See Jiang v. U.S. Att'y Gen.*, 568 F.3d 1252, 1256 (11th Cir. 2009).

A petitioner in removal proceedings is entitled "to *effective* assistance of counsel where counsel has been obtained." *Dakane v. U.S. Att'y Gen.*, 399 F.3d 1269, 1273 (11th Cir. 2005) (per curiam) (quotation omitted). To establish ineffective assistance of counsel, the petitioner must show that (1) his counsel's performance was deficient and (2) counsel's deficiencies prejudiced his case. *Id.* at 1273–74. To establish deficient performance, the petitioner mush show that his counsel's performance "was deficient to the point that it impinged upon the fundamental fairness of the hearing such that the alien was unable to reasonably present" his case. *Id.* (quotation omitted). And to show prejudice, the petitioner must demonstrate that the performance of counsel was "so inadequate that there is a reasonable probability that but for the attorney's error, the outcome of the proceedings would have been different." *Id.* at 1274 (citation omitted).

Pursuant to federal regulations, an immigration practitioner must maintain communication with the client throughout the duration of the client-practitioner relationship and must take reasonable steps to do so "in a language that the client understands." 8 C.F.R. § 1003.102(r). A practitioner's responsibilities in maintaining such communication include "[p]romptly comply[ing] with reasonable requests for information" and reasonable consultation "with the client about the

means by which the client's objectives are to be accomplished." *Id.* A practitioner must "meet with the client sufficiently in advance of a hearing or other matter to ensure adequate preparation of the client's case." *Id.*; *see also Figeroa v. I.N.S.*, 886 F.2d 76, 79 (4th Cir. 1989) ("At the very least, whether in a trial, an administrative proceeding, or settlement, plea or business related negotiations, an attorney is ethically bound to act in the best interests of his client, and to follow his client's wishes." (citing ABA Code of Professional Responsibility, Canons 6, 7 and EC7–1)).

We acknowledge the highly deferential standard of review that the BIA is due. But the unique facts of Sow's case present the rare situation where we must find that the BIA was arbitrary and capricious in exercising its discretion. *Ali*, 443 F.3d at 808.

First, Sow established deficient performance. The BIA reasoned that Gurian's performance was not deficient because he reasonably relied on evidence that Sow was directly involved in gathering. But Sow was not involved in gathering evidence. Because Sow was detained, his involvement was limited to reviewing evidence that Ibrahim, Diallo, and Gurian collected on his behalf. Sow repeatedly sought to review and correct the mounting evidence. But his efforts were unsuccessful, as Gurian refused to allow Sow access. When Sow finally had the opportunity to review some of the evidence, he attempted to communicate his

13

concerns to Gurian.  But Gurian either did not listen, or could not understand Sow, no doubt due to the language barrier and lack of an interpreter.  In fact, Gurian failed to obtain an interpreter for *any* of their meetings or phone conversations, a sanctionable offense.  *See* 8 C.F.R. § 1003.102.  As a result, Sow was unable to communicate with his counsel about the substance of his case.

Gurian also failed to familiarize himself with the case.  For example, during the merits hearing, Gurian was unaware of basic facts like how many asylum applications Sow had submitted and how many individuals named Djibril Barry were involved in the case.  And because of Gurian's failure to review the evidence, he submitted contradictory affidavits.  The evidence was not only internally inconsistent—he submitted multiple, contradictory affidavits prepared by Djibril Barry—but it was also inconsistent with his own client's account.  As the Third Circuit has said in a similar context, "evidentiary inconsistencies . . . would have been avoided by competent counsel." *Fadiga v. U.S. Att'y Gen.*, 488 F.3d 142, 162 (3d Cir. 2007).  Taken together, Gurian's many deficient acts "impinged upon the fundamental fairness of the hearing such that [Sow] was unable to reasonably present" his case.  *Dakane*, 399 F.3d at 1273–74 (quotation omitted).

Second, Sow established that counsel's deficiencies prejudiced his case. The IJ's denial of asylum was based entirely on the inconsistencies in the evidence, and competent counsel would have realized that the affidavits included

14

inaccuracies and never would have submitted them.  The IJ further stated that, if Sow was "credible, then the Court will believe that he is gay and therefore, suffered in his country on account of being gay . . . so if he had been persecuted on account of his sexual orientation then he should, in fact, be given asylum based upon past persecution."  We therefore do not need to speculate as to whether the outcome may have been different if Gurian had performed adequately.  The IJ's uniquely direct statement confirms that it would have.  Because the IJ explicitly said that he would have granted Sow's application but for the evidentiary inconsistencies, we have no trouble concluding that there is a reasonable probability that the outcome of Sow's merits hearing would have been different with adequate assistance of counsel.  *See id.* at 1274.

Accordingly, we grant Sow's petition, vacate the BIA's decision, and remand to the BIA with instructions to remand to the IJ for reconsideration of Sow's asylum application.

**PETITION GRANTED.**